**UNITED STATES of America,**
**Plaintiff,**

v.

**FRANKLIN ELECTRIC CO., INC., United Dominion Industries, Limited, and United Dominion Industries, Inc., Defendants.**

No. 00–C–0334–C.

United States District Court,
W.D. Wisconsin.

Aug. 30, 2000.

Joan Farragher, U.S. Dept. of Justice, Antitrust Div., Washington, DC, Thomas J. Horton, Willie Hudgins, Joan Farragher, Mike Hammaker, Maribeth Petrizzi, Bruce Yamanaga, Aaron Hoag, Paul Moore, Chinita Sinkler, Orrick, Herrington & Sutcliffe LLP, Washington, DC, for U.S.

William D. Sullivan, Howrey, Simon, Arnold & White, Washington, DC, for Franklin Elec. Co., Inc., United Dominion Industries Ltd., United Dominion Industries, Inc.

Daniel H. Squire, Wilmer, Cutler & Pickering, Washington, DC, for Veeder-Root Co.

## OPINION AND ORDER

CRABB, District Judge.

This is a civil antitrust action brought by the United States against defendants Franklin Electric Co., Inc., United Dominion Industries, Limited, and United Do-

minion Industries, Inc., under § 7 of the Clayton Act, 15 U.S.C. § 18, to enjoin a planned joint venture between Franklin Electric and United Dominion Industries, Inc. (For the remainder of this opinion, I will refer to defendant United Dominion Industries, Inc. as United; its parent, United Dominion Industries, Limited, plays no role in the litigation.) The government sought a temporary injunction in early June that I denied for three reasons: 1) defendants had not had adequate time to prepare to defend the motion; 2) the parties agreed they could be ready for trial on the government's motion for a permanent injunction at the end of July; and 3) defendants agreed to take no steps to accomplish the joint venture until the court reached a decision on that motion. The trial proceeded as scheduled and the parties completed their post-trial briefing on August 21.

To put this dispute into context, defendants Franklin Electric and United are the only two companies in the United States that develop, manufacture and sell submersible turbine pumps used for pumping petroleum products out of underground storage tanks at service stations. Franklin Electric does this through its subsidiary, FE Petro, and United, through its subsidiary, The Marley Company. The parties agree that the planned joint venture is a horizontal acquisition in which the new company, Petroleum Submersibles, LLC, will acquire both FE Petro and the submersible turbine pump assets of The Marley Company. They agree as well that the relevant geographic market is the United States and that the relevant product is the development, production and sale of 4″ submersible turbine pumps for use in retail gasoline stations.

The government believes that the acquisition will eliminate all realistic competition for the submersible turbine pump product not only because the competitors will decrease from two to one, but also because there are no foreign manufacturers that have competitive products, the field has many barriers to entry and there are no substitute products. Defendants

view the picture entirely differently. They see the planned acquisition as changing the identities of the two competitors but not reducing the competition; the net result of the acquisition will be two companies continuing to compete. This is because defendants' merger plan includes entering into a licensing agreement with a company named Environ, which is in the petroleum products business and, in defendants' eyes, ideally positioned to add a submersible turbine pump product to its lines. Under the licensing agreement, Environ will have access to all of defendant United's submersible turbine pump-related intellectual property; in addition, it will have a contractual right to purchase the United Dominion STP product and sell it under its own name for at least two years. Defendants believe that this arrangement will resolve all of the government's concerns about competition: Environ is a strong company known for innovation; the STP product will be an apt fit for its product line; the company will face no barriers to entry because it will be using a known product that has Underwriters Laboratory approval and that it can sell without infringing defendants' patents; and it will be able to offer customers a package deal on pumps, piping and dispensers, with opportunities for package discounts.

As attractive as defendants make out the licensing arrangement to be, I conclude that defendants have failed to show that there will be no change in the competitive picture if the joint venture is consummated and that plaintiff has shown the reasonable probability of substantial impairment of competition if defendants Franklin Electric and United are permitted to go forward with the venture, whether or not the venture includes the accompanying licensing and supply agreements with the potential competitor, Environ. The presumption the government starts with, which is that a merger of the only two competitors in the market is a violation of § 7, remains unrebutted. Therefore, I will grant the government's request

for a permanent injunction prohibiting the acquisition.

From the evidence adduced at trial, I find the following facts.

## FACTS

### A. *The Parties*

Defendant Franklin Electric Co., Inc., is an Indiana corporation headquartered in Bluffton, Iowa. It is the world's largest manufacturer of submersible electric motors and a leading producer of engineered specialty electric motor products and electronic drives and controls. Defendant United Dominion Industries, Inc. is a wholly owned subsidiary of defendant United Dominion Industries, Limited, with its corporate headquarters in Charlotte, North Carolina. It produces flow control products, pumps, agricultural machinery, test instruments and construction products. Defendant Franklin sells submersible turbine pumps through its FE Petro subsidiary; defendant United sells its pumps through its Marley subsidiary. Marley and FE Petro are the only firms developing, manufacturing and selling submersible turbine pumps in the United States at the present time. (It may not be accurate to call FE Petro a "manufacturer" of pumps; in fact, it purchases component parts and does only the assembling in its own facility in McFarland, Wisconsin.) Marley markets its product under the Red Jacket label; FE Petro sells as FE Petro.

In early 1997, the two companies sued each other, alleging infringement or invalidity of FE Petro's patent on the variable length STP. The companies settled the litigation by a grant of cross-licenses under which each could continue its existing practice of variable length technology and Marley would sell its STP motor business to Franklin Electric and take back a long term motor supply agreement. In addition, Franklin Electric promised to help Marley sell its water pump business if it ever decided to do so and guaranteed Marley a price of [REDACTED] for the sale.

Defendant United entered the submersible turbine pump business in 1993 when it acquired The Marley Company, which had been incorporated in 1878 as Red Jacket Manufacturing Co., a manufacturer of water pumps. In 1956, Phillips Petroleum and Gulf Oil signed Red Jacket up to design and develop a submersible turbine pump for use in gas stations in the United States. At the present time, Marley designs, manufactures and sells submersible turbine pumps, mechanical and electronic leak detection devices and submersible and surface pump water systems.

FE Petro was incorporated as a subsidiary of defendant Franklin Electric in July 1988 by Charles Franklin (who is apparently no relation to anyone at Franklin Electric). Charles Franklin had been working for Marley and took early retirement. Bored in retirement, he started FE Petro after acquiring tooling and parts from Gilbarco, a company that had manufactured submersible turbine pumps but had abandoned the business, and obtaining a commitment from defendant Franklin Electric to supply STP motors. Franklin designed a manifold and pump and began production, outsourcing the manufacture of the major components. The company sold its first four units in December 1989. Within three years it had made a $1 million sale to a major oil company.

In November 1992, FE Petro acquired the STP assets of Tokheim Corporation. At the time of the acquisition, Tokheim's market share was 10% to 12% of the STP market.

### B. *The Product*

An STP has three components: a motor, a pumping unit and a discharge head. The pump is inserted into an underground storage tank through an opening just large enough for the motor and the 4″ diameter pumping unit. The motor sits a few inches off the bottom of the tank; the distribution head sits on top of the tank. It contains the manifold and connects to the underground network of pipes running to the dispensers. In addition it contains the electrical supply that provides power to the pumping mechanism. STPs come in a

variety of motor horsepowers and are often equipped with variable speed and variable length features. The variable speed drive allows the pump to maintain a constant flow no matter how many dispensers are operating at any particular time. The telescoping shaft allows the STP to be adjusted to fit a variety of underground storage tanks and service station configurations. Both Marley and FE Petro produce 4 inch and 6 inch STPs; both produce STPs in ⅓, ¾, 1.5, 2, 3 and 5 horsepower sizes.

Submersible turbine pumps are considered a significant improvement over the suction pumps they have replaced primarily because the suction pumps are located inside each dispenser and submersibles are located within the underground storage tank. A gas station might have 6 banks of dispensers drawing from two or three storage tanks. (Stations that blend their medium grade gas at the dispenser from a combination of regular and premium need only two tanks.) With submersible pumps, a gas station would need only two or three pumps, rather than the 18 suction pumps that would be required. In addition, submersibles provide a greater flow rate than suction pumps, more flexibility in the location of storage tanks and are not subject to the vapor lock to which suction pumps are susceptible in high temperatures. With these advantages, submersibles have almost eliminated the use of suction pumps both in existing stations and in the construction of new retail service stations.

In 1995, FE Petro introduced the variable length STP (also referred to as the telescoping shaft), which has the advantage of allowing the pump length to be set at the job site, thus accommodating any combination of tank or bury dimension changes without affecting the UL listing. The new product allows distributors to stock a reduced number of STPs to meet the needs of end users. FE Petro offered the variable length STP at the same price as its fixed length STP in an effort to increase its share of United States sales. In early 1996, FE Petro introduced a variable speed STP or Intelligent Submersible Turbine. The two innovations were instrumental in increasing the company's share of United States sales. In 1996, Marley introduced its own version of variable length STPs.

C. *The Domestic Petroleum Market*

Both FE Petro and Marley sell their STPs primarily through independent petroleum distributors, who sell a wide range of petroleum equipment to gasoline service station owners, operators and building contractors and who increasingly act as project supervisors on new gas station installations and renovations. It is common for a distributor to assume responsibility for implementing a basic gas station design, specifying equipment and construction, overseeing the construction and scheduling and inspecting deliveries. Distributors sell to independents and to major oil companies. In addition, defendants sell directly to the major oil companies. Customers for STPs are interested in having more than one supplier for competitive purposes and often make their purchasing decisions on the basis of price.

As of June 1998, Marley held a larger market share of sales to distributors; it had approximately the same share of direct sales to major oil companies as FE Petro. As of 1996, FE Petro had 42% of all sales in the United States, up from 21% in 1993. North American sales of STPs in 1999 for both companies were $25–30 million.

In 1988, the Environmental Protection Agency promulgated regulations requiring the upgrading of underground tanks in service stations and elsewhere. These regulations spurred demand for petroleum equipment, including STPs, as service stations took the opportunity to upgrade all aspects of their operations in compliance with the regulations. The deadline for compliance was December 1998. Since that time, total STP sales in the United States have fallen by more than half. This drop has been offset in part by an increase in sales outside the United States.

The number of gasoline service stations has declined every year for the last ten years. Not surprisingly, the average number of gallons pumped per site has risen, driving the need for higher flow, variable speed STPs. This increased use will raise average unit prices of STPs.

A new gas station costs about $1.2 million, not including the price of the land. An STP costs about $1000. An increase or decrease in the price of an STP will not affect the demand for the product because the demand is highly inelastic; in other words, it is dependent on the construction of new service stations, a factor beyond the control of defendants.

During the same period in which service stations were investing in upgrades, the major oil companies underwent extensive consolidation. Exxon and Mobil merged, as did BP, Amoco and Arco. Shell and Texaco combined their petroleum equipment purchasing power through a purchasing alliance known as Equiva Services, LLC. The middle man, the distributor, has consolidated as well. The major distributors are expanding their market power and the services they provide. Of the more than 700 petroleum equipment distributors in the United States, the 20 largest control more than 20% of STP sales. The largest firms have the power to extract significant discounts and rebates from STP producers.

### D. Competition

During the period from 1988 to 1995, when Marley had 80–95% of the sales of submersible turbine pumps in the United States, it displayed few of the indicia economists associate with dominant market power. In particular, it did not raise prices during this time beyond cost of living increases and its variable margins (net sales less variable costs) were flat during the entire period. However, customers noticed a decline in service during this period and FE Petro has seen Marley's service improve since the mid–90s.

After FE Petro had emerged as a competitor and instituted a policy of honoring all warranty claims, Marley changed its policy accordingly. After FE Petro introduced a variable speed pump, Marley developed one of its own, after which FE Petro lowered the prices for some of its variable speed models. Recently, Marley has taken the lead in products with the introduction of the new Quantum and Maxxum STPs, which outperform FE Petro's comparable models. In response, FE Petro is redesigning its plastics to increase the STP flow rate. The companies compete in pricing, rebates, volume discounts, promotions, credit terms and product consignment (delivering product to a distributor and not requiring payment until it is sold).

FE Petro views Marley Red Jacket as the price leader. FE Petro will match competitive pricing by Marley. [REDACTED] FE Petro and Marley have the ability to discriminate in pricing by charging different prices to different customers.

It is one of FE Petro's goals to become the sole source for STPs.

### E. Proposed Joint Venture

[REDACTED] Overall, defendant United has significant assets. It does not claim to be failing. [REDACTED] The company manufactures both water pumps and STPs in one large plant in Davenport, Iowa, in which the capacity far exceeds the company's manufacturing needs.

United approached Franklin Electric in October 1999 to discuss the sale of its water pump business. At that time, it had not decided to try to sell its petroleum pump business. However, it [REDACTED] indicated to Franklin Electric that it would be willing to discuss selling its petroleum pump business as well. During the time in which these discussions were occurring, Danaher Corp., the parent company of Veeder–Root, expressed an interest in buying Marley's STP business but not its water pump business. Veeder–Root remains interested in the purchase. Another pump producer has expressed an interest in acquiring Marley's STP business.

On April 6, 2000, defendants Franklin Electric and United entered into a joint venture agreement under which Franklin Electric would contribute all its stock in FE Petro and United would contribute all of Marley's STP assets, including the Davenport plant, to a joint venture entity to be formed under the name Petroleum Submersibles, LLC. Defendant Franklin Electric agreed to purchase Marley's water pump business as well. Defendant Franklin Electric would own 75% of the interests in Petroleum Submersibles in exchange for a contribution of $50,300,000 to the joint venture; Marley would receive a 25% ownership interest and $50,300,000 in exchange for its contribution of assets. Franklin Electric would have managing control of the company, with the right, but not the obligation, to purchase Marley's interest at a price set in the agreement. (If this option is exercised, Franklin Electric's total payment to United would exceed $65 million.) Marley would have a concomitant right, but no obligation, to sell its interest to Franklin Electric. (The parties do not explain how interlocking rights without obligations would work in practice.)

Defendant Franklin Electric expects to achieve millions of dollars of annual manufacturing efficiencies in material, labor, freight and handling costs, manufacturing overhead reductions and administrative and finance cost reductions, which it intends to invest in expanding sales outside the United States and designing innovations for the international market. However, Franklin Electric did not conduct a detailed analysis of expected cost savings before entering into the joint venture agreement. It has no specific plans for achieving the efficiencies. The vice-president of Franklin Electric did not discuss potential efficiencies with the president of FE Petro. Franklin Electric has not analyzed the effect of sales by Environ on Franklin Electric's or Petroleum Submersible's volume-related efficiencies.

### F. Licensing, OEM and Motor Supply Agreements with Environ

On June 23, 2000, defendant Franklin Electric entered into a motor supply agreement with Environ, a supplier of petroleum equipment products for service stations. (The parties had signed a letter of intent on April 26, 2000.) At the same time, Petroleum Submersibles, LLC, entered into a technology licensing agreement and original equipment manufacturing supply agreement with Environ. All of the agreements were to become effective upon the closing of the joint venture. Adding the licensing and motor supply agreements for Environ did not change the financial terms of the joint venture.

Environ's product lines include coaxial flexible piping used for transporting petroleum products from the STP discharge head to the dispenser; underground storage tank entry boots; storage tank and dispenser sumps; and assorted fittings. The company has been in business for ten years and has become a leading supplier of petroleum equipment. It sells its products to end-users directly and also through more than 400 distributors in the United States and more than 100 distributors outside the United States. It manufactures products that involve rotational molding, multi-layer pipe extrusion, rubber transfer molding and reactive injection molding and it outsources products and components that require casting and machining. It has manufacturing facilities in North Carolina and England. It has UL approval for all of its products that require such approval. Environ has been an innovator in its field and holds dozens of patents on such devices as flexible underground piping, coaxial cables and fittings, and it has patents pending on innovations relating to dispensers and STPs.

Environ's net sales declined from 1998 to 1999. The company and its parent have taken a number of steps to improve its financial position, such as selling off related companies, closing plants and moving Environ's headquarters to North Carolina.

Environ has no formal business plan for an STP business. It did not finish its due diligence investigation before it signed the licensing agreement and it has not undertaken any written analysis of the costs it could expect to incur in re-selling STPs.

Environ intends to introduce a newly designed dispenser at the annual industry show in the spring of 2001 (earlier, it had planned to make the introduction at the fall 2000 show) and begin full production in 2001 or 2002. For several years, it considered entry into the STP field. It secured a source of motors in [REDACTED], designed several improvements over existing STP technology and constructed STP test equipment to obtain comparative data on both existing STPs and its own design. It ceased these development efforts in 1999, when it failed to obtain UL approval for its design of the variable length feature, which required designing around existing patents, and when it was unable to design an STP that would be financially competitive with FE Petro and Marley Red Jacket. The company has not decided whether it will use the money it received from the sale of a company for dispenser development or for STP work. The company has only four employees with engineering degrees, plus another three or four "street engineers," presumably persons trained on the job. Recently, it lost a key engineering manager who had worked for Red Jacket and was knowledgeable about STPs.

Under the motor supply agreement with defendant Franklin Electric, Environ will have the right but no obligation to buy any or all of Franklin Electric's STP motors for use in manufacturing STPs at the same prices at which Franklin Electric currently sells to Marley. Price increases are limited to the lesser of increases in the Producer Price Index or increases in the prices for Franklin Electric water pump motors. (Franklin Electric has several competitors in the supply of water pump motors.) The supply agreement runs from year to year, renewable at Environ's option.

Under the technology licensing agreement with Petroleum Submersibles, Environ will receive a license for all of the technology used by Marley to produce STPs, including all of Marley's know-how, mechanical drawings, industrial, commercial and scientific information related to STPs, intellectual property and trade secrets. The license is perpetual and worldwide and is a sole license. Submersible Petroleum cannot license the technology to anyone else. The royalty is a lump sum payment of [REDACTED] and permits Environ to exploit the technology by either manufacturing STPs itself or outsourcing the manufacture of the component parts. Environ plans to start immediately toward production of a "Yellow Jacket" STP, using Marley's intellectual property.

## G. Barriers to Entry

The pump in an STP must be designed so that it does not produce sparks that would ignite the gasoline in which the STP is submerged and cause an explosion. In the United States, Underwriters Laboratories certification is required for all submersible motors and pumps. At present, defendant Franklin Electric is the only company manufacturing submersible motors that are approved by UL for sale in the United States. Veeder–Root tried to enter the STP business but was unable to find a manufacturer who could supply a suitable motor or was willing to do so.

Defendants have a number of patents on their STPs; a competitor would have to design around these or wait until they expired.

FE Petro and Red Jacket are recognized names in the submersible turbine pump market; distributors and gas station operators know their reputation for product quality, delivery, warranties and service. Prompt delivery and quick service response time are critical to service station operators. One malfunctioning STP stops the dispensing of an entire grade of gasoline. A serious malfunction could cause a catastrophic explosion. When a major oil company or distributor specifies a product,

it takes into account the length of time the product manufacturer has been in business.

In the STP industry, costs of entry are high in relation to the size of the market and realizable profits.

### H. *Substitution*

The greater advantages of submersible turbine pumps would not cause any significant number of domestic purchasers to substitute suction pumps if there were a small but significant increase in the price of the pumps. Similarly, such an increase would not cause any significant number of domestic purchasers to buy submersibles produced overseas because there are no foreign importers of the pumps.

### RELEVANT TERMS OF AGREEMENTS WITH ENVIRON

In addition to the facts I have found from the trial, certain provisions of the licensing and motor supply agreements are relevant to the decision. The motor supply agreement provides that it can be terminated by Environ upon three months' written notice (with Environ's having certain obligations to purchase inventory held for it), by either party in the event of a substantial breach or default of the other party and upon the bankruptcy or insolvency of one party. Franklin Electric agrees not to discontinue manufacture of any units without a year's advance notice to Environ. Environ is obligated to estimate its *motor* needs semi-annually and is to give Franklin Electric at least 30 days' notice of requested delivery dates and destinations for export shipments.

Under the OEM supply agreement, Environ's price for pumps is determined by the prices charged to Petroleum Submersibles' distributors reduced by certain percentages. The agreement requires Environ to give Petroleum Submersibles the country of origin for all its sales and 30 days' notice of requested delivery dates and destinations for export shipments. *See* ¶ 4. The two-year term of the agreement is subject to automatic renewal unless at least three months before the renewal date either party advises the other that it does not elect to renew. *See* ¶ 1B. Petroleum Submersibles can discontinue any STP unit it is providing to Environ with one year's advance notice. The agreement does not prohibit Petroleum Submersibles from using less expensive materials in the STPs it manufactures for Environ or cutting its prices on the FE Petro STPs to gain a market advantage. It does not obligate Petroleum Submersibles to upgrade the units it sells Environ if it upgrades its own pumps. The agreement contains no guarantee of prompt or even timely deliveries.

The OEM agreement gives Environ the right to review price terms of Petroleum Submersibles' Marley STP purchasers and to obtain an independent audit of Petroleum Submersibles' pricing information. Petroleum Submersibles is required to notify Environ whenever it changes its discount or rebate schedule.

### OPINION

 Section 7 of the Clayton Act, 15 U.S.C. § 18, prohibits any person engaged in commerce from purchasing any part of the assets of another person engaged in commerce, where "the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly." Under this section, a transaction is presumed illegal if the plaintiff can show that the combined entity would have a significant market share in a sufficiently concentrated market. *See United States v. Philadelphia National Bank,* 374 U.S. 321, 363, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963). Defendants' proposed joint venture is presumptively illegal because it will result in a merger of the only two competitors in the relevant market selling the relevant product. The new firm will control all of the submersible turbine pump productive capacity.

Defendants deny that this is the result, contending that under the licensing arrangement they have reached with Envi-

ron, their merger will not change the number of competitors in the market but only their identities. Instead of FE Petro competing against Marley's Red Jacket, it will be Petroleum Submersibles competing against Environ. To the government's objection that as a new and untested supplier of submersible turbine pumps, Environ will be a weak competitor with not even a minuscule share of the market or of sales, defendants have a number of responses. First, they argue that the submersible turbine pump market is quite different from most consumer markets, which tend to be made up of large numbers of potential buyers for any product. The submersible turbine pump market is dominated by a relatively small number of potential buyers, all with significant economic clout and a great interest in insuring that there are at least two competing sources for submersibles. Market share or percentage of sales is almost irrelevant in this context; the correct inquiry is not whether one of the competitors has the larger share of the market in terms of sales but whether both of the competitors have the capacity to compete for the next sales opportunity. This is because the companies seeking bids want to have at least two bidders for every contract.

Second, defendants argue that Environ is far better equipped to sell submersible turbine pumps than FE Petro was when it first started. Environ has a sales staff, a headquarters and a production facility, working relationships with over 400 representatives, a name in the industry and a product line in which the submersible pump will be an apt fit. When FE Petro was launched, Charles Franklin's only staff was himself and his wife. He built his office and assembly facility himself and went out and made his own sales. Even with these handicaps, FE Petro made its first million dollar sale of submersible pumps within its second full year of sales, at a time when its market share was almost too small to measure. Environ could achieve the same kind of sales, simply by being the alternative supplier, whether or not it had any "market share" in the form of sales at the time.

At the outset, a word about the burden of proof is in order. Plaintiff bears the burden of showing the reasonable probability that the proposed joint venture will result in a substantial impairment of competition. That burden never shifts to defendants. However, defendants have the burden of proving their contention that because of the proposed licensing and supply agreements with Environ the number of competitors will not change.

On paper, Environ is an ideal candidate for a competitor: it is innovative; it has big plans for the petroleum industry; it has a name in the industry, together with a sales and support staff and relationships with over 400 distributors; it has an existing facility and it would face no immediate barriers to entry if it sold the UL approved pump. On closer inspection, however, the scheme looks more questionable. The firm is paying only [REDACTED] for the licensing agreement, which, as plaintiff points out, is a minimal incentive to adhere to the licensing agreement. It is hardly the kind of investment that would lock the company into a long-term relationship with the new venture if it discovered the agreement was not financially advantageous or if for any reason it chose to divert its resources to another end. Of more concern is the company's limited financial resources, small staff and high priority goals. It is involved heavily in the design and production of an entirely new dispenser, much sought by major oil companies. With limited financial resources, a small staff and influential customers waiting for a result, it is inevitable that Environ will direct its resources toward that project. Only a company with a much larger research budget than Environ's and an excess of talented engineers would be able to focus on the dispenser project *and* on an STP development project for which there is little market interest and on which the company has already devoted several years and undisclosed amounts of money without success. Even if Environ made

the questionable business decision to set aside the dispenser project and concentrate on STP development, it would be an extended period of time before it could develop a cost-effective, competitive pump that would lure customers away from the tried and trusted pumps produced by Petroleum Submersibles' predecessors. It is unlikely that it could do so within the two-year term of its OEM agreement with Petroleum Submersibles.

Under the OEM supply agreement, Environ's gross profit margins are so low as to raise more cause for concern. Unless Environ can sell pumps at a competitive price, it will have no chance of breaking into the market. If it has to reduce its prices too far in order to make sales so that the sales become a financial drain on the company, it will have no incentive to stay in the market.

On the other hand, it is hard to imagine any reason other than the achievement of a dominant position in the market that would explain why Franklin Electric would be willing to spend over $65 million to acquire what it and Marley characterize as a business that had declined rapidly in a significantly restricted domestic market. Franklin Electric's asserted "efficiencies" resulting from the acquisition are speculative at best and do little to justify the acquisition price. FE Petro has excess capacity and outsources its own pump components; Franklin Electric has not explained why it would need or even want the excess manufacturing space that Marley finds to be an albatross, dragging down the profits of United Dominion. The inescapable conclusion is that Franklin Electric is willing to pay a premium price in order to control the development, production and sale of all domestic submersible turbine pumps and that its various agreements with Environ are nothing more than insubstantial window dressing to conceal its monopolistic motives. Not only are the proposed arrangements inadequate to insure the long term existence of a viable competitor, they give Petroleum Submersibles so much control over the supply of pumps and so much information about the destination of those pumps as to raise new and independent questions about the actual "competition" that can occur.

Defendants make much of the argument that market power is a prerequisite to a finding of an antitrust violation; that in this case market share (and with it, market power), cannot be determined on the basis of sales because the particular characteristics of the submersible turbine pump market make sales an inappropriate measure of the ability to compete. They argue that the only appropriate criterion for determining market share is capacity, because the major oil companies and large distributors are large, sophisticated consumers so concerned with having competitive bids that they base their contracting decisions solely on the supplier's ability to meet their supply needs. In other words, according to defendants, it makes no difference that one supplier has 55% or more of the sales in one year; on any contract bid, that supplier can easily be outbid by a supplier who has only 2%, so long as the second supplier has the capacity to supply the product. At the present time, defendants assert, FE Petro and Marley have equal shares of the market measured in terms of capacity. After the joint venture with the various agreements with Environ, Petroleum Submersibles and Environ will have equal shares of the market measured by capacity. Therefore, they say, there is no change in market power. Environ will be able to bid on any contract that is offered because it will have a reliable source of supply under its OEM supply agreement.

In support of their position that sales alone do not evidence market power, defendants cite the absence of evidence that Marley was able to exert market dominance during the years in which it had no real competition for the sale and servicing of submersible turbine pumps. They point to the enormous effect that FE Petro had on Marley almost as soon as it entered the market, despite its small share of sales. It is true that Marley was not able to charge supracompetitive prices during the period from 1988 to 1995 when it was essentially

the only player in the submersible pump market and that its inability to do so was dictated by the nature of its customers and their demands. However, there is extensive evidence that during this same time Marley was not overly concerned about either making improvements in its product or providing excellent service. Although defendants put this down to bad employment decisions by Marley, it is likely that Marley would not have endured its staffing mistakes as long as it did had it not been for the lack of competition to spur it to make changes. As to whether Environ will have the same capacity to bid as Petroleum Submersibles, I have considerable doubt, given the disadvantages under which it will be laboring.

In any event, it is not necessary to decide whether defendants are correct or whether plaintiff has proven that market share is determined by capacity only when the products are interchangeable. However market share is analyzed and determined is irrelevant in this case, because defendants have failed to show that their agreements with Environ change the manner in which their joint venture should be viewed, that is, as anything other than a merger to monopoly that by definition will have an anticompetitive effect on the submersible turbine pump market. *See, e.g.,* IV Phillip E. Areeda, et al., *Antitrust Law* ¶ 911 ("No merger threatens to injure competition more than one that immediately changes a market from competitive to monopolized.") Determining the proper way of analyzing market share or market power is hardly necessary when considering a monopoly.

Given the nature of the market for submersible turbine pumps and the nature of the product, a monopoly producer would be able to increase prices significantly before gas station operators would turn to substitute products or major oil companies would sponsor new development efforts in the way they did in the 1950s. The price of an STP is too small in relation to the cost of an entire station to cause customers to look for substitutes or develop their own. The various barriers to entry would enable Petroleum Submersibles to control production and sale for at least three years, if not longer. Certainly, defendants have not shown that entry is so easy that Petroleum Submersibles could not sustain monopolist profits for some period of time. *See* Areeda, *supra,* ¶ 911b ("when merger creates a monopolist or dominant firm we would always place on the defendant the burden of showing that entry is so easy that monopoly profits could be sustained for any significant length of time"). Defendants point to the relatively brief time it took FE Petro to become a competitive spur to Marley as evidence of the difficulty Petroleum Submersibles would have in maintaining monopolistic profits or attitudes for any length of time. There is no guarantee that history will repeat itself, even if Environ proves to be as capable a company as FE Petro. The economic picture for pump producers is entirely different in this decade.

It would be odd if a merger of the kind at issue, from two producers to one, could be justified by either the efficiencies it would generate or because the company to be acquired is failing. Even if either defense is theoretically possible, there is no evidence that Marley or its parent is failing or that this is "an acquisition that is likely to lead to lower prices via expansion of output through economies of other efficiencies [that] will benefit consumers, suppliers and other economic players." *FTC v. Elders Grain,* 868 F.2d 901, 904 (7th Cir.1989). Defendants have not made the necessary showing that efficiencies would result *and* that they would lead to benefits for consumers in the relevant market. Not only is the evidence of true efficiencies wanting, but the profits such efficiencies would generate would be unlikely to affect the American customer. Defendant Franklin Electric plans to use any savings from greater efficiencies to penetrate the overseas market.

I conclude that the United States has shown the reasonable probability of substantial impairment of competition if defendants Franklin Electric Co. and United Dominion Industries, Inc., are permitted to

proceed with their planned joint venture, with or without its accompanying licensing and supply agreements with Environ. Accordingly, its request for a permanent injunction will be granted.

### ORDER

IT IS ORDERED that the motion of the United States of America for a permanent injunction against the planned joint venture of defendants Franklin Electric Co., United Dominion Industries, Inc. and United Dominion Industries Limited is GRANTED. Defendants are enjoined permanently from proceeding with their planned joint venture, with or without the accompanying licensing and supply agreements with Environ.

The clerk of court is directed to enter judgment for plaintiff United States of America and close this case. This opinion is to be kept sealed and out of the public file until the parties have had an opportunity to be heard on the need for redaction of any portions of the opinion that refer to confidential business information.