IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

January 25, 2008

Charles R. Fulbruge III
Clerk

_____

No. 05-60192

_____

CHICAGO BRIDGE & IRON COMPANY N.V., a foreign corporation, and

CHICAGO BRIDGE & IRON COMPANY

Petitioners

v.

FEDERAL TRADE COMMISSION

Respondent

_____

Petition For Review Of An Order
of the Federal Trade Commission

_____

Before REAVLEY, GARZA, and DENNIS, Circuit Judges.

DENNIS, Circuit Judge:

Chicago Bridge and Iron Company, a Dutch corporation, and its United States subsidiary, Chicago Bridge and Iron Company, (collectively, "petitioner" or "CB&I"), petition for review of an order of the Federal Trade Commission ("Commission")[1] to divest assets acquired from Pitt-Des Moines, Inc. ("PDM"),

---

[1] We use the term "Commission" to refer to the Commissioners at the Federal Trade Commission that decided this case at the final administrative level. Its opinion at issue on this appeal is Chicago Bridge & Iron Co., et al., 2005 WL 120878 (FTC), Docket No. 9300 (Jan. 6, 2005) ("Op."). We use the term the "Government" to refer to complainant counsel executing the Federal Trade Commission's separate investigatory and enforcement

a Pennsylvania corporation, used in the business of designing, engineering and building field-erected cryogenic storage tanks. The Commission ruled that CB&I's acquisition of these assets on February 7, 2001 would likely result in a substantial lessening of competition or tend to create a monopoly in the relevant markets in violation of section seven of the Clayton Act, 15 U.S.C. § 18, and section five of the Federal Trade Commission Act, 15 U.S.C. § 45. We DENY the petition for review.

I.

Before the acquisition, both CB&I and PDM designed, engineered, and constructed industrial storage tanks in the United States for liquified natural gas (LNG), liquified petroleum gas (LPG), and liquid atmospheric gases, such as nitrogen, oxygen, and argon (LIN/LOX), as well as thermal vacuum chambers (TVCs) for testing aerospace satellites. The two firms were the dominant suppliers of the products in these four relevant United States markets. Before 2001, they had a virtual duopoly in those markets. Between 1990 and 2001, they were the only builders of LNG tanks in the United States. Between 1975 and the acquisition, they were the only builders of LNG tanks for import terminals, and they built all but 7 of the 95 peak-shaving LNG tanks constructed in the United States. In the LPG tank market, between 1990 and the acquisition, all but two of the 11 projects were awarded to CB&I and PDM. In the LIN/LOX tank market, the only other significant competitor, Graver Tank, left the market in 2001, leaving CB&I as the dominant firm now in that market. In the TVC market, CB&I and PDM were the only firms that had built any large, field-erected TVCs in the United States since 1960.

---

functions. In other words, the "Government" brings a complaint before the "Commission" for adjudication. See 16 C.F.R. §§ 3.2, 3.11; see also Genuine Parts Co. v. FTC, 445 F.2d 1382, 1388 (5th Cir. 1971).

On February 7, 2001, CB&I acquired all of PDM's assets relating to these four markets for approximately $84 million. Prior to the acquisition, the Commission notified CB&I that it had significant antitrust concerns about the acquisition and was conducting an investigation.[2] On October, 2001, the Commission issued an administrative complaint charging that CB&I's acquisition of those assets of its principal competitor, PDM, violated Section 7 of the Clayton Act, 15 U.S.C. § 18 and Section 5 of the Federal Trade Commission (FTC) Act, 15 U.S.C. § 45. An Administrative Law Judge (ALJ) held an evidentiary hearing, issued an Initial Decision, concluding that CB&I had violated both Acts and ordered a divestiture of the assets. After briefing, argument and a de novo review of the record, the Commission issued a final order affirming the ALJ's determination of liability and issuing a modified divestiture order.

In its order, the Commission adopted the ALJ's decision with some modifications. Noting that the relevant product and geographic markets are undisputed, the Commission affirmed the ALJ's determination that the acquisition's effects must be assessed in each of the United States markets for LNG, LPG, and LIN/LOX tanks, and for TVCs. Op., at 9. Finding that sales of the relevant products had been sporadic, the ALJ rejected the traditional method of measuring market concentration with the Herfindahl-Hirshmen Index (HHI)

---

[2] On August 29, 2000, CB&I and PDM entered into a letter of intent for CB&I to acquire the assets from PDM. On September 12, 2000, CB&I notified the U.S. Department of Justice of the proposed acquisition per 15 U.S.C. § 18a, which requires notification for certain large acquisitions of securities and assets. Under 15 U.S.C. § 18b, the parties were required to wait thirty days before concluding the transaction. More than thirty days later, but before executing the acquisition, the Commission notified CB&I that it had begun its investigation. See 15 U.S.C. § 46; 16 C.F.R. § 2.1. CB&I initially agreed to delay executing the merger to accommodate the Government's investigation. Approximately four months after the expiration of the 30-day statutory waiting period, on February 7, 2001, CB&I concluded the deal and acquired PDM's pertinent assets for approximately $84 million.

on an annualized basis. Id., at 3. Nonetheless, based on the bidding history in each market, the ALJ found that the acquisition resulted in an undue accretion of market power in CB&I that could not be constrained by timely entry of new competitors. Id. The Commission disagreed with the ALJ's complete disregard for the HHI, stating that, because CB&I and PDM had been the only competitors in the relevant markets for the past two decades, it was appropriate to analyze their sales data over an extended time frame. Id., at 18. Using the HHIs accordingly, the Commission concluded that the resulting market concentration established a prima facie case that the acquisition violates Section 7 of the Clayton Act and Section 5 of the FTC Act. Op., at 18-20. Furthermore, the Commission found an independent reason for a prima facie case of presumptive illegality in the qualitative evidence showing that the acquisition left CB&I as the only major player in each of the relevant markets, e.g., the views of customers with first-hand knowledge that CB&I and PDM were the only LNG tank suppliers and that the acquisition substantially harmed competition; CB&I's and PDM's own documents confirmed that they focused almost exclusively on each other in assessing competition and paid little or no attention to other companies. Id., at 19-20.

The Commission also found that evidence of high entry barriers necessarily strengthened the anti-competitive effects of the acquisition. Id., at 29. In addition to customer testimony and behavior in past LNG project awards, the Commission cited reasons that entry into the relevant markets is exceedingly difficult and cannot be achieved in a timely fashion: the nickel-steel composition in LNG tanks requires a specialized construction skill set; LNG tanks require sophisticated engineering, trained supervisors, knowledge of local

4

labor markets, as well as specialized procedures and proprietary techniques.[3] Id., at 30. Additionally, the FERC regulatory and approval process is complicated and potentially time consuming; customers expect significant experience in builders of LNG tanks that takes a number of years to gain. Op., at 53-56. Thus, the Commission concluded that CB&I's long-standing dominance in the relevant U.S. markets gives it a virtually insurmountable advantage over newly entering competitors. Accordingly, the Commission decided that the entry and expansion in the relevant markets are not likely to replace the competition lost through the acquisition or to sufficiently constrain CB&I in a timely manner. E.g., id., at 82.

CB&I did not contend that the acquisition would lead to enhanced efficiencies benefitting competition. Rather, it argued that the evidence of high market concentration and entry barriers was rebutted by evidence of recent actual and potential entry into three of the four markets. On examining the record evidence, however, the Commission affirmed the ALJ's finding that the purported new entry is insufficient to constrain CB&I post-acquisition. Id., at 82. Three joint-ventures identified by CB&I as new entrants lacked sufficient experience to compete effectively with CB&I. None had built an LNG tank in the United States. At the time of trial, none had won a LNG tank bid post-acquisition while CB&I had won six sole-source contracts during that period. Customers with upcoming LNG projects were not aware of the alleged new entrants. The Commission concluded that although the new entrants had taken a step toward competing in the United States by partnering with United States construction firms, they cannot likely restore the competition lost as a result of

---

[3] The discussion here refers primarily to the LNG tanks, because both appellants and appellee focus on the LNG market and extrapolate the general conclusions about the LNG market to all markets.

CB&I's acquisition of PDM's relevant assets in the foreseeable future. Id., at 58.

The Commission ruled that CB&I's acquisition of these assets would likely result in a substantial lessening of competition in the relevant markets in violation of section seven of the Clayton Act, 15 U.S.C. § 18, and section five of the Federal Trade Commission Act, 15 U.S.C. § 45. Id., at 105. The Commission expanded the divestiture remedy, ordering CB&I to divide its cryogenic business into two separate entities (New CB&I and New PDM) equally capable of competing in the four markets.[4]

CB&I contends that the Commission: (1) applied incorrect legal standards in shifting burdens of proof and persuasion; (2) applied incorrect legal standards related to the petitioner's "actual and potential entry" defense; (3) found, without substantial evidentiary support, that CB&I failed to rebut the Government's prima facie case; and (4) abused its discretion in its remedial order.

II.

This court reviews the Commission's factual determinations under the substantial evidence standard. 15 U.S.C. § 21(c); Jim Walter Corp. v. FTC, 625 F.2d 676, 683 (5th Cir. 1980). "Substantial evidence is evidence that provides a substantial basis of fact from which the fact in issue can be reasonably inferred." Diamond Drilling Co. v. Marshall, 577 F.2d 1003, 1006 (5th Cir.

---

[4] On February 1, 2005, CB&I filed with the Commission a petition to reconsider in light of further evidence of actual new entry of foreign competitors into the relevant markets. On March 11, 2005, CB&I filed a petition for review of the December 21st Order and Opinion with this court. See 15 U.S.C. § 45(c). On May 10, 2005, the Commission denied the petition regarding actual new entry because CB&I had failed to show that any new entry could counteract competition lost from CB&I's acquisition of PDM. See Chicago Bridge & Iron Co., et. al., 2005 WL 2329811, Docket No. 9300 (2005) ("R.O."). On December 15, 2005, CB&I filed a motion to adduce additional evidence, substantially similar to new evidence submitted in the petition to reconsider below, with this court. We denied this motion on April 13, 2005.

1978). We review de novo all legal questions pertaining to Commission orders. FTC v. Ind. Fed'n of Dentists, 476 U.S. 447, 454 (1986).

Section 7 of the Clayton Act prohibits acquisitions, including mergers "where in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly."[5] 15 U.S.C. § 18; see United States v. Philadelphia Nat'l Bank, 374 U.S. 321, 355 (1963) ("The statutory test is whether the effect of the merger may be substantially to lessen competition in any line of commerce in any section of the country.") (internal quotations omitted); see also Brown Shoe Co. v. United States, 370 U.S. 294, 323, n.39 (1962) ("'The use of these words ('may be') means that the bill, if enacted, would not apply to the mere possibility but only to the reasonable probability of the prescribed (sic) effect * * *. The words 'may be' have been in section 7 of the Clayton Act since 1914. The concept of reasonable probability conveyed by these words is a necessary element in any statute which seeks to arrest restraints of trade in their incipiency and before they develop into full-fledged restraints violative of the Sherman Act. A requirement of certainty and actuality of injury to competition is incompatible with any effort to supplement the Sherman Act by reaching incipient restraints.'") (quoting S. Rep. No.1775, 81st Cong., 2d Sess. 6, U.S. Code Cong. and Adm. News 1950, p. 4298); see generally FTC v. H.J. Heinz Co., 246 F.3d 708 (D.C. Cir. 2001) (citing H.R. Rep. No. 1142, at 18-19 (1914)).

1. The Commission Correctly Applied the Legal Standards of Burdens of Proof and Persuasion

---

[5] The appeal at issue primarily concerns section 7 of the Clayton Act as section 5 of the FTC Act is, as the Commission determined and the parties do not contest, a derivative violation that does not require independent analysis. See Op., at 5 n.23.

CB&I first challenges the Commission's application of the legal standards for production of evidence and persuasion.

The burden-shifting framework for deciding Clayton Act section 7 actions first requires the Government to establish a prima facie case that an acquisition is unlawful. See H.J. Heinz Co., 246 F.3d at 715 (citing United States v. Baker Hughes, Inc., 908 F.2d 981, 982-83 (D.C. Cir. 1990)). Typically the Government establishes a prima facie case by showing that the transaction in question will significantly increase market concentration, thereby creating a presumption that the transaction is likely to substantially lessen competition. Id. Once the Government establishes the prima facie case, the respondent may rebut it by producing evidence to cast doubt on the accuracy of the Government's evidence as predictive of future anti-competitive effects. Id. Finally, if the respondent successfully rebuts the prima facie case, the burden of production shifts back to the Government and merges with the ultimate burden of persuasion, which is incumbent on the Government at all times. Baker Hughes, 908 F.2d at 982-83; FTC v. Univ. Health, Inc., 938 F.2d 1206, 1219 (11th Cir. 1991); Kaiser Aluminum & Chem. Corp. v. FTC, 652 F.2d 1324, 1340 (7th Cir. 1981).

CB&I contends that the Commission's conclusion that CB&I failed to rebut the government's prima facie case was reached by erroneously subjecting CB&I to a burden of persuasion rather than switching the burden of production back to the Government after CB&I offered its rebuttal evidence. We disagree and, instead, conclude that the Commission reasonably found that the evidence produced by CB&I simply failed to rebut the Government's prima facie case. As occurs in most cases, the Government introduced all of its evidence at once. In addition to making a prima facie case based on concentration numbers and a detailed examination of competitive conditions in each market, the

Government presented evidence that all relevant markets are difficult to enter. The Government's evidence not only established its prima facie case that CB&I's acquisition likely would have anti-competitive effects; it also served as a redoubt against CB&I's evidence that actual or potential entry of new competitors would offset the merger's substantial lessening of competition. The Commission expressly decided that, based on the totality of the evidence, CB&I had not rebutted the Government's prima facie case. From our review of the record and the Commission's opinion, we conclude that the Commission's decision is supported by substantial evidence and that the Commission did not improperly place the burden of persuasion upon CB&I.

CB&I primarily relies on Baker Hughes as the authority for the burden-shifting framework within the anti-trust context. The Ninth and Eleventh Circuits interpret Baker Hughes' burden-shifting language as describing a flexible framework rather than an air-tight rule. The Ninth Circuit in Olin Corp. v. FTC distinguishes Baker Hughes by holding that the Commission does not need to switch burdens back to the Government if the Government addresses the respondent-company's rebuttal evidence in its prima facie case; in other words, based on an assessment of the rebuttal evidence in light of the prima facie case, the Commission can determine that the respondent company's rebuttal does not satisfy its burden of production and therefore decline to switch the burden of production back to the Government. 986 F.2d 1295, 1305 (9th Cir. 1993). The Ninth Circuit writes:

> The clearest reason why Baker Hughes does not control here is that the Commission responded to the Company's rebuttal, whereas in Baker Hughes the government did not. In the present case, the Commission pointed to evidence indicating why Olin's viability argument should fail. The Commission is able to do this because it is Olin's burden to rebut a prima facie case of illegality.

Id. (citations omitted). We believe the same situation applies in this case. The Government's prima facie case addresses why the rebuttal evidence is not sufficient and CB&I's construal of the rebuttal evidence is not credible; therefore the Commission can conclude CB&I's burden of production on rebuttal is not satisfied without having to formally switch the burden of production back to the Government. The Eleventh Circuit in Univ. Health, Inc. approves Baker Hughes' general framework but concludes, in accord with the Ninth Circuit, that, in practice, evidence is often considered all at once and the burdens are often analyzed together. 938 F.2d at 1218-19 & n.25. The Eleventh Circuit writes:

> Conceptually, this shifting of the burdens of production, with the ultimate burden of persuasion remaining always with the government, conjures up images of a tennis match, where the government serves up its prima facie case, the defendant returns with evidence undermining the government's case, and then the government must respond to win the point. In practice, however, the government usually introduces all of its evidence at one time, and the defendant responds in kind. This is particularly true when the government seeks a temporary restraining order or, as here, a preliminary injunction and, thus, time is of the essence.[6]

Id.; see also Baker Hughes, 908 F.2d at 991 (calling the "distinction between [the burden of production] and the ultimate burden of persuasion" "always an elusive distinction."); FTC v. Butterworth Health Corp., 121 F.3d 708, 1997 WL 420543, *1 (6th Cir. Jul. 8, 1997) (unpublished) (calling Baker Hughes burden-shifting

---

[6] CB&I misinterprets the last sentence to argue that the Eleventh Circuit's flexible reading of the burden-shifting framework applies only when time is of the essence. Without any basis in the text, CB&I narrows the Eleventh Circuit's opinion. Reading the passage as a whole, the Eleventh Circuit considers the Baker Hughes framework as generally flexible in practice for all situations, but only emphasizes the need for flexibility when time is of the essence. See Univ. Health, 938 F.2d at 1219 n.25 ("This is particularly true when the government seeks a temporary restraining order or, as here, a preliminary injunction and, thus, time is of the essence.") (emphasis added).

framework "somewhat artificial."). The Ninth and Eleventh Circuit interpretations of the Baker Hughes burden-shifting framework accommodate the practical difficulties in separating the burden to persuade and the burdens to produce. The flexible approach allows the Commission to preserve the prima facie presumption if the respondent, CB&I, fails to satisfy the burden of production in light of contrary evidence in the prima facie case.

CB&I then challenges the order by contending the Commission imposed an onerous burden of production that approximates a burden of persuasion. The Commission must determine whether the defendant has come forward with sufficient evidence to rebut the government's prima facie case; but the Government continues to bear the burden of persuasion even after it has made out a prima facie case through statistical evidence; the defendant is not required to present a defense upon which he bears the burden of proof in the sense of ultimately persuading the trier of fact that he is entitled to relief. See Automatic Canteen Co. of Am. v. FTC, 346 U.S. 61, 80-82 (1953); Vanity Fair Paper Mills, Inc. v. FTC, 311 F.2d 480, 486 (2nd Cir. 1962); see also Kaiser Aluminum, 652 F.2d at 1340; cf. Fed. R. Evid. 301. The burden of production is "the obligation to come forward with evidence of a litigant's necessary propositions of fact." EI v. Se. Penn. Transp. Auth. (SEPTA), 479 F.3d 232, 237 n.6 (3d Cir. 1997). Under the burden of production, even if the respondent produces evidence, the court must "credit[]" the evidence and the evidence must "justify" the rebuttal arguments the respondent espouses. Baker Hughes, 908 F.2d at 992; see also id. at 991 (noting the rebuttal evidence should "discredit[] the data underlying the initial presumption in the government's favor"). In other words, the Commission can judge whether the nexus between the rebuttal arguments and the proffered evidence is plausible so as to satisfy the burden of production as a matter of law.

See, e.g., Olin Corp., 986 F.2d at 1303; Univ. Health, Inc., 938 F.2d at 1223-24. We therefore read the Commission's opinion as deciding whether respondent's rebuttal arguments and evidence plausibly and justifiably "show[ ] that the market-share statistics give an inaccurate account of the acquisition's possible effect on competition in the relevant market" so as to satisfy its burden of production as a matter of law. Cf. Id. at 1218. Under the flexible approach, the Commission can decide this in light of any argument in the prima facie case that may undermine the rebuttal evidence. Olin Corp., 986 F.2d at 1305.

Nevertheless, the Commission cannot impose too exacting a standard that might approach a burden of persuasion, which would require a party to "convince the factfinder at trial that a litigant's necessary propositions of fact are indeed true." EI, 479 F.3d at 237 n.6. However, the Commission has some discretion to decide if the respondent's proffered evidence justifies its arguments in rebuttal. See, e.g., Olin Corp., 986 F.2d at 1305-06 (finding a rebuttal argument "not plausible" in light of the proffered evidence); see also United States v. Marine Bancorporation, 418 U.S. 602, 631 (1974) ("Appellees introduced no significant evidence . . . .") (emphasis added); FTC v. Staples, 970 F. Supp. 1066, 1083 (D. D.C. 1997) ("To meet [its] burden, the defendants must show that the market-share statistics give an inaccurate prediction of the proposed acquisition's probable effect on competition."). In addition, if a Government's prima facie case anticipates and addresses the respondent's rebuttal evidence, as in this case, the prima facie case is very compelling and significantly strengthened. Op. at 49 ("Complainant Counsel have established a strong prima facie case."). Under these conditions, the respondent's burden of production on rebuttal is also heightened. Baker Hughes, 908 F.2d at 991 ("The more compelling the prima facie case, the more evidence the defendant must

present to rebut it successfully."). By carefully examining the rebuttal evidence in light of strong and relevant contrary evidence in the prima facie case, the Commission did not unjustifiably impose a "heavy burden" on CB&I to "clearly" disprove future anti-competitive effects. Baker Hughes, 908 F.2d at 991 (noting that a burden to "clearly" disprove future anti-competitive effects is too onerous a standard for judging the burden of production).

Analogous with the situations in Olin Corp. and Baker Hughes, the Commission here never identified the exact standard used in assessing whether the respondent's rebuttal satisfied its burden of production in this case. Olin Corp., 986 F.2d at 1305 n.11. Neither the Government nor the Commission urges an unreasonable evidentiary burden on the respondents. The Commission reasonably found, based on substantial evidence, that CB&I's somewhat ineffectual evidence did not rebut the Government's stalwart prima facie case. Id. at 1305; Automatic Canteen Co., 346 U.S. at 81-82. We, therefore, do not find improper burden-shifting in this case.[7] Based on the foregoing, the Commission properly applied the correct legal standards in concluding that "[CB&I] [has] not rebutted Complainant Counsel's prima facie case." Op., at 91.

---

[7] The mere fact that the Commission used the word "persuasive" does not prevent this court from independently examining the context of its conclusions and affirming the judgment if it was indeed correct under the proper legal standards. Cf. Rebel Oil Co., Inc. v. Atlantic Richfield Co., 51 F.3d 1421, 1435-36 (9th Cir. 1995) (engaging an independent review of the evidence despite respondent's claim that the trial court's "persuasive" language possibly implied an improper weighing of the evidence). In any event, CB&I misconstrues the Commission's use of the word "persuasive," and its use does not suggest any improper burden-shifting. The Commission did not use "persuasive" to compare CB&I's evidence to the prima facie evidence. Instead, in the instances cited by CB&I, (1) the Commission describes CB&I's arguments that certain conclusions should be inferred from its evidence as "unpersuasive" and does not address the evidence itself, see, e.g., Op. at 61, Op. at 71, Op. at 91, R.O. at 9; and (2) the Commission describes a customer's statement as internally "unpersuasive," because it contradicts the customer's other proffered evidence; again, this does not describe any comparison between CB&I's evidence and the prima facie case. See Op. at 65.

## 2. The Commission Properly Analyzed the "Potential Entry" Defense and had Substantial Evidence to Conclude that "Potential Entry" Evidence was Insufficient to Rebut the Prima Facie Case

### A. The Commission Applied the Correct Legal Standard For Analyzing the "Potential Entry" Defense

CB&I also argues that the Commission addressed the incorrect analytical question concerning the extent of potential entry necessary to counteract any anti-competitive effects. CB&I argues that the correct legal standard should have been: "if there was a supracompetitive price increase, entry would be sufficient to counteract such an increase." See, e.g., Cargill, Inc. v. Monfort of Colorado, Inc., 479 U.S. 104, 119 n.15 (1986) ("In evaluating entry barriers in the context of a predatory pricing claim, however, a court should focus on whether significant entry barriers would exist after the merged firm had eliminated some of its rivals, because at that point the remaining firms would begin to charge supracompetitive prices, and the barriers that existed during competitive conditions might well prove insignificant."). Instead, according to CB&I, the Commission considered only whether there was already entry sufficient to constrain CB&I from raising prices. CB&I mischaracterizes the Commission's analysis. The Commission not only addressed whether existing entry is sufficient to constrain CB&I from raising prices but also used existing entry and the history of entry as evidence in determining whether future entry would be able to counteract a merger's anti-competitive effects, such as a supracompetitive price increase. See United States v. General Dynamics Corp., 415 U.S. 486, 501 (1974) ("Thus, companies that have controlled sufficiently large shares of a concentrated market are barred from merger by § 7 [of the Clayton Act], not because of their past acts, but because their past performances imply an ability to continue to dominate with at least equal vigor."); see also

14

Brown Shoe Co., 370 U.S. at 322 n.38 ("[O]nly a further examination of the particular market – its structure, history, and probable future – can provide the appropriate setting for judging the probable anticompetitive effect of the merger."); FTC v. Nat'l Tea Co., 603 F.2d 694, 700 (8th Cir. 1979). In this case, the Commission clearly concluded that:

> The history of these markets reveals that they have not been characterized by easy entry and expansion and have been dominated by [CB&I and PDM] for decades . . . The evidence strongly suggests that this dynamic would have continued absent the merger, and [CB&I and PDM's] own strategic planning documents predicted that the merged firm would "dominate" the relevant markets. Thus, to determine whether the entry [CB&I] suggest[s] is likely to restore competition lost from the merger, [the Commission] must determine whether a sea-change has occurred in the markets so as to render inapplicable the competitive conditions that have held for so long. Based on the evidence, [the Commission] conclude[s] that such is not the case and that the entry and expansion alleged by [CB&I and PDM] are not sufficient to constrain CB&I's conduct in the foreseeable future.

Op., at 9; see also Op., at 53 ("[The Commission] conclude[s] that these new entrants do not confront CB&I with competition sufficient to constrain it from raising prices."). The Commission also clearly stated: "In light of these assertedly low entry barriers, [CB&I] then argue[s] that potential entrants either already constrain CB&I or can be expected to enter the market in the event of anticompetitive price increased by CB&I . . . We . . . reject [CB&I's] arguments." Op., at 83. Thus, the Commission concludes that if supracompetitive pricing existed, the new entrants would be insufficient to counteract it - the exact legal standard CB&I proposes.

B. There Is No Structural Change in the Markets to Indicate That the Potential for Future Entry Would Be Any Greater than the Minimal Entry of the Past

CB&I also argues that the evidence of potential entry can be distinguished

15

from the history of actual entry because structural changes in the market create a tendency toward stronger competition. See Baker Hughes, 908 F.2d at 986 (citing United States v. Int'l Harvester, 564 F.2d 769, 773-779 (7th Cir. 1977)). As we stated in Fort Worth Nat'l Corp. v. Fed. Sav. & Loan Ins. Corp.:

> . . . Congress provided [the Commission] authority for arresting mergers at a time when the trend to a lessening of competition was still in its incipiency. Application of this standard requires not merely an appraisal of the immediate impact of the merger upon competition, but a prediction of its impact upon competitive conditions in the future.

469 F.2d 47, 60-61 (5th Cir. 1972) (internal citations and quotations omitted). CB&I's bald assertion does not rebut the Government's strong prima facie evidence. As we discuss later, the Government provides substantial evidence of barriers to entry and substantial evidence that they will continue to exist in the near future. Thus, the Commission relies on substantial evidence for its prediction that no "sea change" in market structure distinguishes current market conditions from the history of market conditions. Op. at 71. CB&I does not provide sufficient evidence in its rebuttal that potential entrants will overcome these entrenched barriers to entry[8] and encourage stronger competition even if there are supracompetitive prices. As the Commission concludes: "In short, the post-acquisition evidence in the LPG market demonstrates no more than two minor competitors submitted bids after the acquisition. We are not, however, persuaded that CB&I's cost-cutting and

---

[8] Entry barriers are "additional long-run costs that were not incurred by incumbent firms but must be incurred by new entrants," or "factors in the market that deter entry while permitting incumbent firms to earn monopoly returns." Los Angeles Land Co. v. Brunswick Corp., 6 F.3d 1422, 1427-28 (9th Cir.1993) (internal quotations omitted); see also Colorado Interstate Gas Co. v. Natural Gas Pipeline Co. Of Am., 885 F.2d 683, 696 n.21 (10th Cir. 1989) ("Barriers to entry are market characteristics which make it difficult or time-consuming for new firms to enter a market.").

margin-shaving represent a 'sea-change' in the market sufficient to overcome the contrary evidence." Op., at 71.

The continued existence of high entry barriers distinguishes this case from Stearns Airport Equipment Co., Inc. v. FMC Corp., 170 F.3d 518, 530 (5th Cir. 1999); in this case, the Government can point to viable specific barriers to foreign firms that CB&I did not sufficiently rebut. These high barriers to entry will prevent sufficient entry to counteract supracompetitive pricing. "Of course, for a potential entrant or the threat of a potential entrant to act as a competitive constraint on incumbent firms, entry -- at least for that firm -- must be easy." Baker Hughes, 908 F.2d, at 986. The Government in its prima facie case identifies substantial evidence of "special industry conditions" that would block and continue to block foreign entrants despite supracompetitive prices not found in the FMC or Baker Hughes cases where barriers to entry were low. See FMC Corp., 170 F.3d at 530.[9]

C. The Commission's Use of the Words "Parity" and "On Par" Does Not Imply The Application of An Incorrect Legal Standard

---

[9] CB&I also misconstrues the I.D. and the Commission opinion to argue that the Commission ignored the ALJ's finding of no supracompetitive price increases post-acquisition. In fact, the ALJ only concluded that the Government did not prove nor was required to prove supracompetitive prices existed post-acquisition. I.D., at 114. Neither the ALJ nor the Commission directly ruled that there were no supracompetitive price increases post-acquisition. See Op., at 91; I.D., at 114. In the pertinent part of the opinion, the Commission rejected the Government's proffered evidence of post-acquisition price increases because while such evidence tends to show the acquisition would lead to anti-competitive conditions, existing evidence was already sufficient to lead to that conclusion. "Whether post-acquisition evidence is admissible depends on the nature of the evidence." Dailey v. Quality School Plan, Inc., 427 F.2d 1080, 1082 (5th Cir. 1970) (citing FTC v. Procter & Gamble, 386 U.S. 568 (1967)); see id. at 576 (rejecting Court of Appeal's reliance on four years of post-merger data as "misapprehend[ing] the standards for its review and the standards applicable in a [Section 7 of the Clayton Act] proceeding."). We read Dailey as providing the trial court discretion in deciding when to admit post-acquisition evidence and Procter & Gamble as concluding that post-acquisition evidence is not dispositive. The Commission thus did not abuse its discretion in so ruling. See In re Plywood Antitrust Litigation, 655 F.2d 627, 637 (5th Cir. 1981).

CB&I also argues that the Commission burdened petitioner with a novel and onerous entry standard, requiring new entrants to enter "on par" with CB&I in order for entry to be sufficient to counteract the acquisition's anti-competitive effects. CB&I misconstrues the Commission's opinion by interpreting the Commission's use of the words "on par" or "parity" out-of-context to mean the Commission required new entrants to be "equal" to CB&I. See Op., at 54, 57, 58. Instead, reading the use of "on par" or "parity" contextually, the Commission is simply commenting on the high barriers of entry that prevent the new entrants from ever competing with CB&I on "an equal footing." Id. at 58 ("While new suppliers appear to have gained or are seeking to gain a toehold in the market, they are not on equal footing with CB&I, and their modest progress cannot restore the vibrant competition that once existed."); see also id. at 67. For example, the Commission refers to the fact that United States customers would not rate the new entrants as having a reputation on par with that of CB&I and therefore would not treat them similarly; such an observation has nothing to do with applying an onerous entry standard but is merely an observation buttressing the conclusion that reputation is a potential barrier to entry. Op., at 54. We read the "equal footing" language to mean that new entrants would be unable to compete at a level able to constrain CB&I's price increases and not so literally to mean that new entrants must be "equal" to CB&I in competitive power.

Other courts have generally concluded that for entry to constrain supracompetive prices, the entry has to be of a "sufficient scale" adequate to constrain prices and break entry barriers. See United States v. Visa USA, Inc., 163 F. Supp. 2d 322, 342 (S.D. N.Y. 2001) (entry must be "timely, likely, and [of a] sufficient scale to deter or counteract any anticompetitive restraints."); Rebel Oil, 51 F.3d at 1440 ("Barriers may still be 'significant' if the market is unable

to correct itself despite the entry of small rivals."); Oahu Gas Serv., Inc. v. Pac. Res., Inc., 838 F.2d 360, 367 (9th Cir. 1988 ); United States v. Falstaff Brewing Corp., 410 U.S. 526, 531-32 (1973) ("The existence of an aggressive, well equipped and well financed corporation engaged in the same or related lines of commerce waiting anxiously to enter an oligopolistic market would be a substantial incentive to competition which cannot be underestimated."); see also U.S. Dep't of Justice and Fed. Trade Comm'n, 1992 Horizontal Merger Guidelines, 57 Fed. Reg. 41552, 41561 (Sep. 10, 1992), at ¶ 3.0 (entry must be "timely, likely, and sufficient in magnitude, character and scope to deter or counteract the [anti]competitive effects of concern.") ("Merger Guidelines").[10] We read the Commission's opinion to suggest that entry would not be at a sufficient scale capable of competing with CB&I and piercing the barriers to entry. See

---

[10] CB&I relies on Baker Hughes to argue that the very threat of entry from foreign firms would constrain anti-competitive effects a fortiori such that it is not necessary that a new entrant enter "on par." See Baker Hughes, 908 F.2d at 988. Such reliance is misplaced. First, Baker Hughes' conclusion that a mere threat of entry is sufficient to constrain anti-competitive effects has been criticized, and we will not adopt it here. See United States v. United Tote, Inc., 768 F. Supp. 1064, 1081 (D. Del. 1991) (noting that interpreting Baker Hughes as encouraging a lax standard is inconsistent with the critical examination of potential entrant's ability to restrain competition); see also 4 Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application ¶ 941h (2d ed. 2000) (criticizing Baker Hughes' lax standards that favor respondents) ("Areeda & Hovenkamp"); Darren Bush & Salvatorre Massa, "Rethinking the Potential Competition Doctrine," 2004 WIS. L. REV. 1035, 1074-79 (2004). Morever, there is a high threshold applied to assertions as to whether a company can be considered a potential entrant for anti-trust purposes. See 2A Areeda & Hovenkamp, at ¶ 422 ("The more concentrated the market and the greater the threat posted by the challenged practice, the more convincing must be the evidence of likely, timely, and effective entry."). The burden of production must provide evidence that the likelihood of entry reaches a threshold ranging from "reasonable probability" to "certainty." CB&I's evidence does not approach either threshold so as to rebut the prima facie case. See BOC Intern'l v. FTC, 557 F.2d 24, 28 n.7 (2d Cir. 1977); FTC v. Atlantic Richfield Co., 549 F.2d 289, 294-295 (4th Cir. 1977); Mercantile Texas Corp. v. Board of Governors of Fed. Reserve Sys., 638 F.2d 1255, 1266 (5th Cir. 1981). Therefore, the Commission had substantial evidence to conclude that CB&I failed to rebut the prima facie case, because there is no such evidence that the threat of potential entrants will constrain the acquisition's anti-competitive effects.

Op., at 67 ("The actual or potential entrants in this market also appear vastly overmatched by CB&I"); Op., at 66 ("[T]he testimony of these customers . . . does not demonstrate that they are adequate replacement for the competition that has been lost.") (emphasis added); Op., at 82 ("[E]ntry pointed to by [CB&I] is insufficient to constrain CB&I post-acquisition.") (emphasis added). Therefore, the Commission applied the correct legal standard and rightfully concluded that potential entrants would not be of a sufficient scale to compete on the same playing field as CB&I and thus would be unable to constrain the likely anti-competitive effects.

3. The Commission Relied On Substantial Evidence For Its Factual Findings

Under the "substantial evidence" standard, "[o]ur task is not to reweigh the evidence but only to determine whether there is such relevant evidence that a reasonable mind might accept as adequate to support a conclusion." Gibson v. FTC, 682 F.2d 554, 571 (5th Cir. 1982) (internal quotations and citations omitted). Contrary to CB&I's contentions, the Commission did not clearly discount the merits of CB&I's arguments and did not make "its decision before it considered any contrary conclusion." Schering-Plough Corp. v. FTC, 402 F.3d 1056, 1065 (11th Cir. 2005). In Schering-Plough Corp., the Commission explicitly ignored obvious Eleventh Circuit precedent supporting the respondent's arguments. 402 F.3d at 1068 n.18. In this case, the Commission did not ignore obvious precedent to reach an unjustified decision. The Commission carefully examined and discussed CB&I's various arguments. We therefore find CB&I's attempt to analogize this case to Schering-Plough Corp. is without merit.

In respect to its argument that the Commission did not rely on substantial evidence for its factual findings, CB&I challenges the Commission's opinion on three grounds: (A) the Government's proffered HHI statistics were misleading

20

predictors of probable future competitiveness in the markets; (B) the Commission's finding of "nearly insurmountable" entry barriers ignores rebuttal evidence to the contrary; and (C) the Commission's finding that CB&I's customers have no real alternatives to CB&I.

A. The Proffered HHIs Can Be Used As Indicators of Probable Future Competitiveness

The HHIs are just one element in the Government's strong prima facie case. Market concentration figures should be examined in the context of the entire prima facie case. See H.J. Heinz Co., 246 F.3d at 717-18. Here, the prima facie case establishes without dispute that the two dominant, and often only, players in these four domestic markets are merging. This indisputable fact "bolster[s]" the Government's market concentration figures. See id. Where the post-merger HHI exceeds 1,800, and the merger produces an increase in the HHI of more than 100 points, the merger guidelines create a presumption of adverse competitive consequences. See Merger Guidelines, 57 Fed. Reg. 41558 at § 1.51; see also United States v. Loew's Inc., 882 F.2d 29, 32, n.2 (2d Cir. 1989); FTC v. Cardinal Health, Inc., 12 F. Supp.2d 34, 53 (D. D.C. 1998). The increases in HHIs in this case are extremely high. HHI increases of 2,635 for the LIN/LOX tank market, 3,911 for the LPG tank market, 4,956 for the LNG tank market, and 4,999 for the TVC tank market are predicted post-merger. An HHI of 10,000 denotes a complete monopoly. See 4 Areeda & Hovenkamp, at ¶ 931d3. Post-acquisition HHIs for the four markets are: 5,845 for LIN/LOX, 8,380 for LPG, and 10,000 for the LNG and TVC markets.

CB&I now urges us to disagree with the Commission's rejection of the ALJ's conclusion that the HHIs were unreliable because the HHIs relied on sporadic sales data, which would generate unreliable market share data. We may scrutinize the HHI statistics more carefully when the Commission's

21

conclusion differs from the ALJ, as in this case. See Schering-Plough, 402 F.3d at 1062. The Commission agrees with the ALJ that the use of HHIs based solely on sales from the 1996-2001 period is unreliable, and therefore extended the sales data time period to a 11-year period, 1990-2001. When sales data are sporadic, a longer historical perspective may be necessary. The Department of Justice and Federal Trade Commission's Merger Guidelines,[11] which describe the standards applied by the Government in exercising its prosecutorial discretion in the anti-trust realm, note, "[t]ypically, annual data are used, but where individual sales are large and infrequent so that annual data may be unrepresentative, the [Department of Justice and the Commission] may measure market shares over a longer period of time." Merger Guidelines, 57 Fed. Reg. at 41557, at § 1.41; cf. 2A Areeda & Hovenkamp, at ¶ 535d (noting that averaging over a significantly long period of time is a solution, albeit an imperfect solution, to "lumpy" sales statistics.).[12] Regardless, the Commission adequately explained why it chose an extended period: (1) the extended period provided more data points, which averages out the year-to-year fluctuations and "chance outcomes" and (2) CB&I presents no evidence that a structural change affected the market, and thus the same market conditions persist in the 1996-2001 time-period as the 11-year period, except the 11-year period has additional data points. See Op., at 19; cf. KeySpan-Ravenswood, LLC v. F.E.R.C., 348 F.3d 1053, 1055-60 (D.C. Cir.

[11] Merger Guidelines are often used as persuasive authority when deciding if a particular acquisition violates anti-trust laws. See United States v. Kinder, 64 F.3d 757, 771 (2d Cir. 1995).

[12] Long-term trends in HHI changes can be used to examine the structure of markets and are used to determine the effect of mergers on the market. See State of N.Y. v. Kraft Gen. Foods, Inc., 926 F.Supp. 321, 362 (S.D.N.Y. 1995). Here, the market trends in HHIs provide substantial evidence that CB&I and PDM have been the dominant players in the relevant markets and do not indicate any trend of reduced concentration; rather, a merger accelerates the trend towards increased concentration, as its previous competitors have dropped out of the relevant markets. Id.

2003).

In any event, CB&I places too much weight on the HHIs as a dispositive measure of market concentration when other indicators of the market structure and history of the market clearly bolster what the HHIs already indicate - that rivals are limited and CB&I and PDM are the only two firms with any market power in these markets. See FTC v. Warner Communications, Inc., 742 F.2d 1156, 1163 n.1 (9th Cir. 1984 ) (concluding that concentration statistics merely provide a "meaningful context within which to address the question of the merger's competitive effects.") (citing Gen. Dynamics Corp., 415 U.S. at 498); see also FTC v. PPG Inds., Inc., 798 F.2d 1500, 1503 (D.C. Cir. 1986) (noting that the use of the HHIs "rests upon the theory, that, where rivals are few, firms will be able to coordinate their behavior, either by overt collusion or implicit understanding, in order to restrict output and achieve profits above competitive levels."). The Commission also provided evidence of high entry barriers and customers' perception of differences between CB&I and potential entrants. See infra Section II.3.C.iii. These circumstances justify a conclusion of high market concentration. See, e.g., R.J. Reynolds Tobacco Co. v. Cigarettes Cheaper!, 462 F.3d 690, 695 (7th Cir. 2006) (concluding that when the market is "concentrated (the Herfindahl-Hirschmann Index exceeds 3,000)," "new entry is difficult if not impossible," and "customers perceive quality differences among brands," a finding of high market concentration is justified). We do not see a problem with using the HHIs as part of this "totality of circumstances" that indicate this acquisition's potential anti-competitive effects. See Baker Hughes, 908 F.2d at 984.

In addition to its challenge of the selection of the time period, CB&I also argues that the "sporadic" nature of the sales data undermines all evidence of market power. In Baker Hughes, 908 F.2d at 986, the D.C. Circuit did conclude

23

that a small number of sales of an esoteric product may suggest concentration statistics are misleading. In Lockheed Martin Corp. v. Boeing Co., 390 F. Supp.2d 1073, 1080 (M.D. Fla. 2005), the court dismissed monopolization claims for the "heavy-lift satellite launch services for the government" market, because the sales data was limited to two launch contracts. We agree that reliance on very limited data, such as two data points may undermine an entire prima facie case. However, we find this to be a very limited exception, such as the extreme situation in Lockheed Martin, because the academic literature has not accepted any broad conclusion that small markets are all per se problematic. See 4 Areeda & Hovenkamp, at ¶ 929; see also FTC v. Food Town Stores, 539 F.2d 1339, 1345 (4th Cir. 1976) ("The fact that the markets in which the firms compete may be small is irrelevant under the Clayton Act, and does not affect the legality of the merger.").

In contrast, for three of the four markets here, the data underlying the HHI for market concentration is not nearly as sparse as that in Lockheed Martin. For the LNG market, from 1990 to the acquisition date, nine LNG tank plants were awarded --- CB&I won five and PDM won four. I.D., at 65. Out of all seventy-five LNG peak-shaving plants in the United States, CB&I and PDM constructed all but six of them (the six were constructed by a now out-of-business competitor). Id. at 64. For the LPG market, out of the eleven LPG tank projects awarded in the United States between 1990 and 2001, CB&I won five and PDM won four. Id., at 213. From 1990 to the Acquisition, 109 LIN/LOX tanks were constructed and CB&I and PDM built 72.8% of these tanks. Id. at 269. The third major player, accounting for 23.3% of those tanks, went out of business in 2001. Id. at 270. This history provides substantial evidence for discerning a trend towards increased market concentration. However, for the same reasons as in Lockheed Martin, we conclude that the evidence in the TVC market is too

24

sparse and sporadic for that market's HHI statistics to be a reliable factor. Lockheed Martin, 390 F. Supp.2d, at 18-19. The TVC market's HHI statistic relies on only one TVC tank project and another proposed project within the eleven-year period. I.D., at 55. Even without the HHI, we find substantial evidence, as did the ALJ, to support the Commission's conclusion that the acquisition has a pronounced anti-competitive effect in the TVC market sufficient to establish the prima facie case. The Government produced evidence that CB&I and PDM were the only two competitors in the market since 1960. See, e.g., I.D. at 97. The Government also provided ample other evidence to establish its strong prima facie case, such as customer testimony, history of the market, and CB&I and PDM's internal documents. See Op., at 28.

We find that the record contains substantial evidence to support the Commission's finding that the HHIs are not completely irrelevant in three of the four markets. Instead of ignoring HHIs, we agree with the Commission that they should be viewed with caution and within the larger picture of long-term trends and market structure. See Brown Shoe, 370 U.S. at 322 n.38. Long-term trends in the market and the Government's other evidence favor what the HHIs also indicate: the proposed merger will substantially lessen competition. Even excluding the HHIs, the Government's other evidence independently suffices to establish a prima facie case in all markets, including the TVC market.

B. Merger Guidelines

CB&I also contends the Commission committed "reversible error" because the Commission failed to follow the Merger Guidelines, 57 Fed. Reg. at 4.1557 § 1.41 n.15. CB&I argues the Commission, in contravention of the Merger Guidelines, did not credit the field of potential entrants with an equal likelihood to win bids but instead identified CB&I as a dominant player and a likely winner in all bid competitions.

CB&I's argument is without merit. CB&I misconstrues the language it cites in the Merger Guidelines.[13] The Merger Guidelines, 57 Fed. Reg. at 4.1557 § 1.41 n.15, simply state: "[w]here all firms have, on a forward-looking basis, an equal likelihood of securing sales, the [Department of Justice and the Federal Trade Commission] will assign firms equal [market] shares." Under this rule, in order to apply an equal number of market shares to the field of competitors, as CB&I urges, the competitors, on a forward-looking basis, must have "an equal likelihood of securing sales."[14] The Commission relied on substantial and overwhelming evidence that there is no equal likelihood to secure bids given the high entry barriers, i.e., because of CB&I's reputation and control of skilled crews. See infra Section II.3.C.iii.

---

[13] Moreover, as we noted earlier in supra note 11, the Merger Guidelines are not binding on the courts and the agency during adjudication but are only highly persuasive authorities as a "benchmark of legality." See United States v. Kinder, 64 F.3d 757, 771 & n.22 (2d Cir. 1995) ("Although it is widely acknowledged that the Merger Guidelines do not bind the judiciary in determining whether to sanction a corporate merger or acquisition for anticompetitive effect, courts commonly cite them as a benchmark of legality."). The Merger Guidelines do not guide adjudicative decisions at the agency and court-level, because they are merely enforcement policy statements that establish standards for exercising prosecutorial discretion. Id.; see also Native Am. Arts, Inc. v. Waldron Corp., 399 F.3d 871, 874 (7th Cir. 2005); Merger Guidelines, 57 Fed. Reg. at 41553 § 0. Enforcement policy is not binding on the agency and has no force of law. See Olin Corp., 986 F.2d at 1300 ("Certainly the [Merger] Guidelines are not binding on the courts . . . or, for that matter, on the Commission.") (emphasis added); Brock v. Cathedral Bluffs Shale Oil Co., 796 F.2d 533, 538 (D.C. Cir. 1986); see also Nat'l Wrestling Coaches Ass'n v. Dep't of Educ., 383 F.3d 1047, 1048 (D.C. Cir. 2004); cf. Ash Grove Cement Co. v. F. T. C., 577 F.2d 1368, 1374 (9th Cir. 1978). CB&I's citation to Nevins v. NLRB, 796 F.2d 14, 18 (2d Cir. 1986) is inapposite. Nevins deals with guidelines concerning the adjudicatory function within the NLRB context, but the Merger Guidelines deal with the enforcement function of the agency and are explicitly denoted as non-binding. Enforcement, unlike adjudication, is also an area the courts are "most reluctant to interfere." See Brock, 796 F.2d at 538.

[14] Even so, the Merger Guidelines delegate much discretion in the application of these rules and reject a "mechanical application" of the Guidelines. Merger Guidelines, 57 Fed. Reg. at 41552. The Merger Guidelines urge the Commission to "apply [the Guidelines'] standards reasonably and flexibly to the particular facts and circumstances of each proposed merger." Id.

C. Commission's Rejection of Rebuttal Arguments, viz., Alleged Market  Entry and Low Entry Barriers, Is Supported by Substantial Evidence

i. Post-Acquisition Evidence Has Little Probative Weight if It Is Manipulable, and Evidence in this Case Is Reasonably Viewed as Manipulable.

We agree with CB&I that post-acquisition evidence may be useful in determining the possibility that new entrants would counteract the anti-competitive effects of an acquisition.  "Whether post-acquisition evidence is admissible depends on the nature of the evidence."  Dailey, 427 F.2d at 1082. Nevertheless, there are significant reasons why post-acquisition evidence's probative value may be limited.  The Supreme Court has so concluded by noting:

[T]he probative value of [post-acquisition] evidence was found to be extremely limited, and judgments against the Government were in each instance reversed in part because 'too much weight' had been given to postacquisition events. The need for such a limitation is obvious. If a demonstration that no anticompetitive effects had occurred at the time of trial or of judgment constituted a permissible defense to a § 7 divestiture suit, violators could stave off such actions merely by refraining from aggressive or anticompetitive behavior when such a suit was threatened or pending.

General Dynamics, 415 U.S. at 504-05; see also Alberta Gas Chemicals Ltd. v. E.I. Du Pont de Nemours and Co., 826 F.2d 1235, 1244 (3d Cir. 1987).  The probative value of such evidence is deemed limited not just when evidence is actually subject to manipulation, but rather is deemed of limited value whenever such evidence could arguably be subject to manipulation.  See Lektro-Vend Corp. v. Vendo Co., 660 F.2d 225, 276 (7th Cir. 1981) ("The post-acquisition evidence in this case is the type which cannot arguably have been subject to the defendant's deliberate manipulation, nor is it likely that the market was less competitive after the acquisition than it would have been otherwise.") (emphasis added); Hosp. Corp. of Am. v. FTC, 807 F.2d 1381, 1384 (7th Cir. 1986)

27

("Post-acquisition evidence that is subject to manipulation by the party seeking to use it is entitled to little or no weight.") (emphasis added). CB&I argues that its post-acquisition evidence is probative, because there is no evidence CB&I manipulated the evidence. We disagree. Any discussion concerning CB&I's alleged manipulation of post-acquisition evidence is irrelevant, because the evidence's probative weight is lessened if it is arguably subject to possible manipulation. The Commission was correct to hold that evidence "subject to manipulation" was the correct standard when deciding whether post-acquisition evidence is probative. See Op., at 62 ("[T]he price reductions cited by the Respondents occurred well after the Complaint in this case issued and are the type of evidence that is wholly manipulable"). The post-acquisition evidence is arguably manipulable because the existence of actual and potential entry sufficient to constrain post-acquisition anti-competitive effects is based on the purported success of these entrants in the bid markets. CB&I could refuse to bid or negotiate with draconian terms in the immediate aftermath of the acquisition so as to permit entrants to win a few bids so as to bolster the market's appearance of competitiveness.[15]

ii. Evidence of Actual Entry Is Outside the Administrative Record

Using post-acquisition evidence, CB&I argues that, post-acquisition, foreign competitors have made significant inroads into the four markets and won several bids. Therefore, CB&I argues this rebuttal evidence shows how actual entrants can constrain post-acquisition anti-competitive effects. However, the evidence of actual entry post-acquisition that CB&I relies on in its brief is outside the administrative record and hence outside the scope of our review. The

---

[15] Just allowing entrants to win bids does not guarantee the entrants would be able to enter the market permanently, since winning a bid does not necessarily result in the successful completion of the project especially in light of evidence that CB&I controls skilled laborers necessary for success that other competitors do not have.

28

evidence in question includes bidding on the Hackberry Project past the preliminary stages (in fact, the brief quotes verbatim passages from evidence attached to CB&I's motion to adduce that we denied). The evidence in question also includes the bids regarding the Cheniere Corpus Christi and Sabine Pass and certain other outstanding bid competitions (Golden Pass LNG and Washington Gas Co.). CB&I cites to its petition for reconsideration filed with the Commission below when discussing this evidence. However, the Commission denied its petition for reconsideration and did not include the evidence attached to the petition in its administrative record. See R.O., at 6 & nn.27-29. In fact, CB&I readily concedes, in its various filings, that the evidence presented below in its petition is outside the administrative record ("post-record") and therefore filed a motion to adduce this evidence both at the Commission level and with this court. The Commission and this court both denied its motions. Despite these clear indications that this evidence is not in the administrative record, CB&I continues to cite to this evidence. We reject its use of this evidence as a basis for its appeal.[16]

Even assuming arguendo that the evidence should be considered, it does

_____

[16] The petitioner's argument that the evidence is part of the administrative record, because the petition for reconsideration at the Commission level was included in Fed. R. App. P. 17's certified list of documents listing the "record" on appeal is without merit. The certified list includes not only "any findings or report on which [the order at issue on appeal] is based," but also any "pleadings, evidence, and other parts of the proceedings before the agency." Fed. R. App. P. 16(a); Fed. R. App. P. 17. Pleadings and evidence relevant to other parts of the proceedings before the agency, such as a petition for reconsideration, do not constitute the administrative record for the order at issue. Moreover, the Commission has explicitly rejected the evidence as a basis for its order in its denial of the petition to reconsider. See Global Van Lines, Inc. v. I.C.C., 714 F.2d 1290, 1298 (5th Cir. 1983) ("It has, moreover, been settled for at least forty years that '[t]he grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based.'") (quoting SEC v. Chenery Corp. (Chenery I), 318 U.S. 80, 87 (1943)).

not alter or affect our decision.[17] Only one piece of this evidence would possibly be relevant to our decision, and this evidence of one successful entry by a foreign company does not affect the substantial evidence upon which the Commission based its decision and our decision to deny CB&I's petition. CB&I's prime example of actual entry is Dynegy's Hackberry project, which was awarded to a foreign firm, Skanska, at the outset, but then awarded to another foreign firm, IHI. CB&I argues that this is evidence that CB&I lost two chances to work on the large Hackberry project. CB&I inaccurately characterizes the evidence. The Commission noted that this evidence was for the whole LNG port, and there was supposed to be a separate bid for the tank work as a sub-contract. R.O. at 12-15. As for the Freeport LNG project, after learning that it was not awarded the entire project, CB&I withdrew from any participation in the project, which might have yielded some tank work as a sub-contract. Id. at 15. The only bid possibly lost on the merits was LNG tank work in the Sabine Pass Project. This single instance post-record is not enough to undermine the Commission's conclusion that the rebuttal evidence of actual entry was not sufficient. The post-record evidence also shows that CB&I was awarded three non-competitive sole-source contracts for LNG tanks in addition to the five commitments before the record closed. R.O. at 17. The proffered evidence tends to reflect that actual entry into LNG market was marginal at best.

iii. CB&I Did Not Rebut Evidence of High Entry Barriers, so a Potential Entry Theory Fails

In the alternative, if the post-acquisition evidence of actual entry is not admitted, CB&I contends these large foreign firms are potential entrants that

---

[17] In addition, for the reasons we noted in Section II.3.C.i, supra, this post-acquisition evidence is likely not very probative, because it can arguably be subject to manipulation.

may constrain the post-acquisition anti-competitive effects. CB&I's argument is without merit. A potential entrant's ability to constrain market power is used in contexts when there is an "ease of market entry." See United States v. Marine Bancorp, Inc., 418 U.S. 602, 628 (1974) ("[E]ase of entry on the part of the acquiring firm is a central premise of the potential-competition doctrine."); FMC Corp., 170 F.3d at 530 ("If barriers in an industry are low, new entrants into the industry will appear when the monopolist raises its prices."). The mere existence of potential entrants does not by itself rebut the anti-competitive nature of an acquisition. The potential entry must face low enough barriers for a threat of potential entry to be likely. Therefore assertions that potential entry may meaningfully constrain market power turns on the existence of low or no entry barriers. See Reazin v. Blue Cross & Blue Shield of Kansas, Inc., 899 F.2d 951, 974 (10th Cir. 1990) ("Thus, we agree with the district court that it properly focused the jury's attention on barriers to meaningful competition - competition which could inhibit anticompetitive conduct.") (citing United States v. Waste Mgmt., Inc., 743 F.2d 976, 983 (2d Cir.1984)); Yamaha Motor Co., Ltd. v. FTC, 657 F.2d 971, 977 (8th Cir. 1981) (noting that an "alleged potential entrant" must have "a substantial likelihood of ultimately producing deconcentration of that market or other significant procompetitive effects") (quoting Marine Bancorporation, 418 U.S. at 633).

We will, therefore, consider CB&I's potential entry argument in concert with evidence regarding the barriers to entry. CB&I contends the Commission's conclusion that CB&I failed to rebut the three main barriers to entry offered in the Government's prima facie case, (1) reputation/experience, (2) regulatory and technical expertise, and (3) access to local labor and trained supervisors, is not based on substantial evidence. Based on the substantial evidence standard, as long as the Commission derives a "reasonable inference" from the evidence that

31

CB&I failed to rebut the prima facie case, we defer to the Commission's findings. See Gibson 682 F.2d at 569.

a.  Reputation/Experience

We agree with CB&I that general reputation alone is not an effective barrier to entry.  Am. Prof'l Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal & Prof'l Publ'ns, Inc., 108 F.3d 1147, 1154 (9th Cir. 1997); see also FMC Corp., 170 F.3d at 531 .  However, unlike FMC Corp. and Am. Prof'l Testing Serv., the Government presents something more than just generalized reputation as a market entry barrier.  Instead, what the Government presents as "reputation" is CB&I's reputation for particular industry-specific traits.  See Advo Inc. v. Philadelphia Newspapers, Inc., 51 F.3d 1191, 1202 & n.11 (3d Cir. 1995) ("[W]e do not question the judgment of other courts of appeals that in other market contexts reputation is a significant barrier to entry.") (citing Thompson v. Metro. Multi-List, Inc., 934 F.2d 1566, 1577 (11th Cir. 1991); U.S. Philips Corp. v. Windmere Corp., 861 F.2d 695, 703 (Fed. Cir. 1988)); see also United Tote, 768 F. Supp. at 1075-76.  Advo concludes that reputation evidence could be considered a market barrier if there is some limiting principle.  Id. at 1202.  The Government presents its reputation evidence in a limited fashion; "reputation" is considered in this case as a proxy for experience and success in building LNG projects in the United States, foremost an understanding of industry-specific U.S. regulations, labor force, and "cost-competitiveness." CB&I is therefore able to distinguish its brand within the industry as the foremost (and now only) domestic expert. Compare Op., at 58, with Dimmitt Agri Indus., Inc. v. CPC Int'l, Inc., 679 F.2d 516, 529 n.12 (5th Cir. 1982) ("When a seller possesses an overwhelmingly dominant share of the market, however, and differentiates its product from others through a recognized and extensively advertised brand name, thereby enabling the seller to control prices or

unreasonably restrict competition, then monopoly power may be found to exist.") (quoting Borden, Inc. v. FTC, 674 F.2d 498, 512 (6th Cir. 1982)). Therefore, the Commission has substantial evidence for its determination that the reputation for expertise and experience in building tank projects in the United States is a barrier to entry, and thus the potential entrants' international reputation evidence offered in CB&I's rebuttal is inapposite.

The Commission presented substantial evidence that domestic reputation was critical to the bidding process in this industry, which CB&I failed to rebut.[18] The Commission showed that (a) the bidding evaluation process takes into account the bidders' experience and history with various projects, see Op. at 34; (b) customers' testimony acknowledging reputation, including domestic reputation, as important for choosing bidders, see Op. at 38, and (c) the industry requires highly sophisticated and specialized construction work and credits reputation and an established brand name, because brand names have a track record with highly specialized and skilled local crews, see Op. at 36. Therefore,

---

[18] The Commission concluded that "[a]ll of the factors work together to help form CB&I's reputation for quality and reliability." Op. at 58. Reputation here can be considered an industry-specific "entrenched buyer preference[] for [an] established brand[]" built into the industry-specific bid process. See, e.g., Am. Council for Certified Podiatric Physicians and Surgeons v. Am. Board of Podiatric Surgery, Inc., 185 F.3d 606, 623 (6th Cir. 1999) ("[E]stablishing credibility naturally seems to be a significant barrier to entry, particularly for an enterprise that depends heavily upon reputation, such as certification of medical specialists."); Los Angeles Land Co. v. Brunswick Corp., 6 F.3d 1422, 1428 n.4 (9th Cir. 1993) ("The main sources of entry barriers are: . . . (3) entrenched buyer preferences for established brands or company reputations.") (emphasis added); cf. FMC Corp., 170 F.3d at 531 ("The question is not whether there are barriers to entry, but rather whether the barriers in a particular industry are large enough to trigger judicial concern.") (emphasis added). District courts have also so held. See, e.g., Cardinal Health, Inc., 12 F. Supp. 2d at 57 ("The sheer economies of scale and strength of reputation that the Defendants already have over these wholesalers serve as barriers to competitors as they attempt to grow significantly in size."); United States v. Franklin Elec. Co., Inc., 130 F. Supp.2d 1025, 1031-032 (W.D. Wis. 2000); see generally United Tote, Inc., 768 F. Supp. at 1075, 1079-81 ("In reality, the weight accorded to reputational barriers to entry will vary with the circumstances of a given case.").

we find the Commission presented substantial evidence that reputation in this specific industry context is a barrier to entry and that CB&I failed to rebut this evidence.

b.  Regulatory and Technical Experience

CB&I also challenges the Commission's conclusion that regulatory experience with the Federal Energy Regulatory Commission ("FERC") is a barrier to entry.  Ability to do FERC work is a component of the bidding proposal and CB&I, in its own advertising materials, advertises FERC's familiarity with and its respect for CB&I.  Op. at 41 n.248.  FERC expertise can be analogized to other technical prerequisites to doing business in a market that are considered barriers to entry.  See United States v. Syufy Enters., 903 F.2d 659, 673 (9th Cir.1990) ("It is well known that some of the most insuperable barriers in the great race of competition are the result of government regulation."); Rebel Oil, 51 F.3d at 1439 (noting that one "main source[] of entry barriers" is "legal license requirements."); cf. Reazin v. Blue Cross & Blue Shield of Kan., 663 F. Supp. 1360, 1435-436 (D. Kan. 1987), aff'd, 899 F.2d 951 (10th Cir.), cert. denied, 497 U.S. 1005 (1990) (recognizing as an entry of barrier "the 'clout' with Kansas hospitals, which defendant itself recognizes.");  United States v. Blue Bell, Inc., 395 F.Supp. 538, 549 (M. D. Tenn. 1975) (recognizing familiarity with setting up the business as a barrier to entry); Atl.  Richfield Co., 439 F.2d at 295 (recognizing "technical expertise" as a barrier to entry).  There is strong prima facie evidence from one customer that a lack of FERC experience is a deal-breaker and a reason to award CB&I sole-source contracts.   Op., at 56-57.  While we agree with CB&I that owners are responsible for filing applications and other outside consultants are available, the fact remains that as part of the bidding process, customers select LNG tank builders depending on whether they would be able to help with the highly technical application process as a

34

component of a whole LNG tank building project. CB&I does present evidence that one foreign firm successfully guided a huge project towards FERC compliance. We cannot conclude that this single instance is production of sufficient evidence to rebut the Commission's finding on this issue; however, even if it were, it is not sufficient evidence to rebut the Commission's general conclusion that high entry barriers exist in these markets based on the findings concerning the other two barriers.

c. The Control over the Specialized Labor Force

"Control of essential or superior resources" is a recognized barrier to entry. Image Technical Serv., Inc. v. Eastman Kodak, Co., 125 F.3d 1195, 1208 (9th Cir. 1997). "Employee skill levels required for a firm to be successful" can be considered a barrier to entry. See In Re IBM Peripheral EDP Devices Antitrust Litig., 481 F. Supp. 965, 976 (N.D. Cal. 1979). Here, the Government presents specific evidence that employee skills in cryogenic tank construction is a limited resource significantly captured by CB&I. See Op., at 37 & n.230. CB&I controls highly specialized supervisory crews resulting in quicker turnaround construction time and lower-priced bids. Id. CB&I has also developed specialized and proprietary welding techniques and trained crews with those techniques. Id. at 38. As the Commission notes, CB&I does not present sufficient rebuttal evidence that potential entrants would be able to develop comparable techniques and train sufficient numbers of supervisory personnel to effectively compete.

We find that the Commission's conclusion that CB&I's evidence does not rebut the strong prima facie case for at least two high entry barriers is a reasonable inference from the evidence presented.

D. Rejection of Rebuttal Evidence that Sophisticated Customers Have Meaningful Alternatives to CB&I is Supported by Substantial Evidence

In the proceedings below, CB&I argues that because customers in these markets are large and sophisticated consumers, they would be able to constrain the anti-competitive effects by altering the bid process and searching for alternatives. Most of the rebuttal evidence for CB&I's "sophisticated customer" defense is derived from post-record evidence, which cannot appropriately be considered in this appeal. Assuming arguendo, however, the propriety of its consideration, CB&I still has not produced sufficient evidence to rebut the Government's prima facie case based on evidence that large and sophisticated customers continue to choose CB&I for sole-source contracts without any bidding, and that CB&I has utilized its market power to force sole-source contracts by choosing not to participate in bidding. See R.O. at 17 & n.82. In other words, there is no history nor other indication that customers who formerly relied on CB&I and PDM for tank design, engineering, and construction services will undertake to perform them on their own. The absence of such evidence, together with the lack of evidence of adequate entry of competitors, undermine the basic premise for this defense. In this respect, this case is unlike Baker Hughes, which CB&I relies on heavily, where there were ample available alternatives for customers in a market with low entry barriers. 908 F.2d at 986 (internal citations omitted); id. at 987 ("Because the defendants also provided compelling evidence on ease of entry into this market, we need not decide whether these findings, without more, are sufficient to rebut the government's prima facie case."). In addition, unlike in Baker Hughes, pricing data for the four markets are mostly confidential from bid-to-bid, and thus buyers are generally unable to ascertain whether CB&I is imposing supracompetitive prices on any particular bid weakening buyers' ability to demand competitive prices. See United States v. Country Lake Foods, Inc., 754 F. Supp. 669, 673 (D. Minn. 1990); Op., at 89-90. Therefore customers have imperfect information and a

36

weak bargaining position that is compounded by the lack of meaningful alternatives. Certain powers held by the customer that would favor a "sophisticated customer" defense are listed in United States v. Archer-Daniels-Midland, Co., 781 F. Supp. 1400, 1417-418 (S.D. Iowa 1991). Such powers are not present here. Under Archer-Daniels, the conditions include the customers' ability to:

> (a) Refus[e] to reveal the prices quoted by other suppliers and the price which a supplier must meet to obtain or retain business, creating uncertainty among suppliers.
> (b) Swing[ ] large volume back and forth among suppliers to show each supplier that it better quote a lower price to obtain and keep large volume sales.
> (c) Delay[ ] agreement to a contract and refusing to purchase product until a supplier accedes to acceptable terms.
> (d) Hold[ ] out the threat of inducing a new entrant into HFCS production and assuring the new entrant adequate volume and returns

Id. at 1418.

None of the factors apply to the present situation, in which: (a) Buyers cannot compare past bids not only because they are mostly confidential, but also because each project is unique; (b) As we noted earlier, the market has had only two dominant players, PDM and CB&I, so buyers cannot now swing back and forth between competitors to lower bids post-acquisition; (c) Instances of CB&I pressuring customers to offer sole-source contracts by withdrawing its bid and CB&I's success at obtaining sole-source contracts undermine any argument that buyers have the ability to pressure CB&I in contract negotiations; and (d) No buyer can assure that a new entrant has "adequate volume and returns" for meaningful entry into the market as there is no evidence that buying power is sufficiently concentrated.

In addition, courts have not considered the "sophisticated customer" defense as itself independently adequate to rebut a prima facie case. "Although

37

the courts have not yet found that power buyers alone enable a defendant to overcome the government's presumption of anti-competitiveness, courts have found that the existence of power buyers can be considered in their evaluation of an anti-trust case, along with such other factors as the ease of entry and likely efficiencies." Cardinal Health, 12 F. Supp.2d at 58; see also 4 Areeda & Hovenkamp, at ¶ 943c. Moreover, the economic argument for even partially rebutting a presumptive case, because a market is dominated by large buyers, is weak. See id. at ¶ 943 (concluding that "it would be inappropriate to give formal recognition to buyer concentration and related factors in the ordinary run of merger cases"). We therefore agree with the Commission that CB&I's evidence of sophisticated customers does not carry the burden for producing evidence sufficient to rebut the Commission's prima facie case.

## 4. The Commission Did Not Abuse Its Discretion In Issuing Its Remedy Provisions

### A. The Remedial Provisions Are Not Overbroad Nor Punitive

CB&I argues that the Commission's remedial provisions are overbroad and punitive. We review the Commission's remedial mandates for abuse of discretion. Jacob Siegel Co. v. FTC, 327 U.S. 608, 611-612 (1946). "[A]ll doubts as to the remedy are to be resolved in [the Commission's] favor." United States v. E.I. duPont de Nemours & Co., 366 U.S. 316, 334 (1961). The Commission is "clothed with wide discretion in determining the type of order that is necessary to bring an end to the unfair practices found to exist." FTC v. Nat'l Lead Co., 352 U.S. 419, 428 (1957). It has "wide latitude for judgment and the courts will not interfere except where the remedy selected has no reasonable relation to the unlawful practices found to exist." Id. (internal quotations omitted).

In this case, the Commission ordered a divestiture of assets to create a competitor, "new PDM," capable of competing on an "equal footing." See R.O.,

at 23. CB&I objects to this remedy, because it would require divestment of PDM's Water Division and potentially other assets.[19] The Government argues that though the assets are unrelated to the construction of cryogenic tanks, they are necessary to enable the separate entity to compete with CB&I on an "equal footing." "Total divestiture is not necessarily inappropriate even though the antitrust violation found relates to but one aspect of the company thus acquired, especially where, as here, total divestiture is deemed necessary to restore effective competition." OKC Corp. v. FTC, 455 F.2d 1159, 1163 (10th Cir. 1972). Total divestiture here "does not appear to be a remedy that 'has no reasonable relation to the unlawful practices found to exist.'" Toys "R" Us, Inc. v. FTC, 221 F.3d 928, 940 (7th Cir. 2000) (quoting Seigel Co., 327 U.S. at 612-613). Here, the violation is the acquisition of a previously viable and independent entity capable of competing on an equal footing. The Commission's divestiture of the water plant division along with the cryogenic tank division is consistent with and relevant to creating a viable competitor, because the water department provides a consistent revenue stream to complement sporadic tank sales. Compare Olin Corp., 986 F.2d at 1307, with Op. at 92, 96. We should be clear to note that the order does not create, as CB&I so misconstrues, two competitors of "equal size." Instead, the remedy only mandates the entities be capable of competing for an "equal share" of the market similar to the situation pre-acquisition. R.O. at 23.

---

[19] CB&I cites to Reynolds Metals Co. v. FTC, 309 F.2d 223, 230-231 (D.C. Cir. 1962), to suggest the Commission failed to distinguish between after-acquired properties and before-acquired properties as in Reynolds. In Cascade Natural Gas Corp. v. El Paso Natural Gas Co., 386 U.S. 129, 136-137 (1967), the Supreme Court assumed after-acquired assets may be included in the divestiture order, though the Court in Cascade Natural Gas remanded the case for an additional hearing on how assets should be divided. Here, instead of a hearing, the Commission devolved authority to decide what assets will be involved in the divestiture to CB&I and the monitor trustee. Permitting the respondent and a trustee to decide, instead of holding another court hearing, is within the Commission's broad authority to fashion relief. The Commission's remedy in this case is also possibly a superior and more efficient method to resolve the issue.

Therefore, as the Commission concluded when the petitioner raised similar arguments below, the new CB&I and new PDM consist of two competitors capable of competing on an equal footing in the relevant businesses as was the situation before the acquisition. R.O., at 23. This means the new PDM only has to become an entity equally capable of competing in the future; the order does not intend CB&I to be split into two equal halves. Id. Instead, the order carefully devolves discretion to CB&I and a third-party monitor to determine how assets must be divided to effectuate the order and its general remedial purpose. Op. at 95 ("[W]e have included a provision that allows the exclusion of the water assets if the acquirer and monitor trustee both find them unnecessary."). Accordingly, as we read the Commission's order, CB&I and the monitor are required to divest to the new separate entity no more nor less of the former PDM assets as are necessary for the new separate entity to compete with CB&I in the relevant markets on an equal footing. Construing the Commission's order as having this meaning and intent, we conclude that the Commission did not abuse its discretion, but instead fashioned a remedy reasonably calculated to eliminate the anti-competitive effects of CB&I's acquisition in violation of the Clayton and FTC Acts.[20]

B. A Separate Evidentiary Hearing Was Not Required In This Case

Finally, the petitioner argues that a hearing was required for the remedy phase of the proceedings separate from the liability phase. We disagree. Generally, a hearing is required if, for example, new evidence was not presented

---

[20] We also find the Commission's detailed decisions in both its Opinion and Decision on Petition for Reconsideration where remedy issues were discussed, see, e.g., R.O., at 23-24, as providing adequate reasons justifying the remedy and its relationship with its objectives. Unlike in United States v. Microsoft, 253 F.3d 34, 103 (D.C. Cir. 2001), which remanded due to the lack of an adequate explanation for the remedy, the Commission provided much more in form and substance than a "mere four paragraphs" to explain its remedy.

at trial or important factual issues were not resolved by the trier of fact in respect to the remedy. See Microsoft, 253 F.3d at 101-102; Am. Can Co. v. Mansukhani, 814 F.2d 421, 425 (7th Cir. 1987). We review the denial of an evidentiary hearing under an abuse of discretion standard. Alberti v. Klevenhagen, 46 F.3d 1347, 1358 (5th Cir. 1995). CB&I now proffers parts of the trial transcripts as evidence that a new evidentiary hearing should be offered. However, that evidence was considered by the Commission in fashioning the remedy imposed. CB&I does not present any new evidence or factual issues critical to the remedy phase not already considered by the trier of fact as a basis for a possible evidentiary hearing. The long trial below offered opportunities for both sides to extensively discuss the ramifications of possible remedies. See Op. at 93-106. The ALJ and the Commission both considered a great amount of evidence relating to the remedy before fashioning the remedial order. Id. There is thus no new factual dispute warranting a remand for an evidentiary trial. Id.

CB&I also requests a remand, because it was allegedly "surprised" by the extent of the remedy.[21] CB&I misconstrues the Commission's order, however, in arguing that the extent of the remedy was a "surprise." The remedy does not, as CB&I contends, create two "equal" tank companies. The remedy, as we have stated above, only requires the creation of two companies equally able to compete for bids in the relevant markets. Any interpretation to the contrary misstates the remedy. Moreover, this was clearly the contemplated relief from the very

---

[21] Even assuming CB&I was surprised by the extent of the remedy, surprise itself does not merit reversal without allegations of prejudice. See Microsoft, 253 F.3d at 103; Eli Lilly & Co. v. Generix Drug Sales, 460 F.2d 1096, 1106 (5th Cir. 1972) ("[S]urprise alone is not a sufficient basis for appellate reversal; appellant must also show that the procedures followed resulted in prejudice."). CB&I does not present any argument "that the lack of notice caused the complaining party to withhold certain proof which would show his entitlement to relief on the merits," thus we cannot reverse based on allegations of surprise alone. Id.

beginning of the proceedings below. In its complaint, the Government gave notice that the possible remedy in this case may include the "[r]eestablishment by CB&I of two distinct and separate, viable and competing businesses . . . and such other businesses as necessary to ensure each of their viability and competitiveness . . . [and] [s]uch other or additional relief as is necessary to ensure the creation of one or more viable competitive independent entities to compete against CB&I in the manufacture and sale of any relevant product." For these reasons, we conclude that the Commission did not abuse its discretion in denying CB&I's request for a rehearing and an additional evidentiary hearing on the remedy to be imposed in this case.

We therefore DENY the petition to review the Federal Trade Commission order.